Marvin Jay BOUWKAMP, II,
Appellant (Defendant),

v.

STATE of Wyoming, Appellee (Plaintiff).

No. 90–57.

Supreme Court of Wyoming.

June 2, 1992.

Public Defender Program: Leonard D. Munker, State Public Defender, Steven E. Weerts, Sr. Asst. Public Defender, David Gosar, Appellate Counsel, Cheyenne, for appellant.

Joseph B. Meyer, Atty. Gen., John W. Renneisen, Deputy Atty. Gen., Karen A. Byrne, Sr. Asst. Atty. Gen., Hugh Kenny, Sr. Asst. Atty. Gen., Cheyenne, for appellee.

Before URBIGKIT, C.J., and THOMAS, CARDINE, MACY and GOLDEN, JJ.

GOLDEN, Justice.

Marvin J. Bouwkamp appeals from his conviction of first degree murder in the death of Lucien Millox on May 25, 1989, near Buffalo, Wyoming. Bouwkamp received a sentence of life in prison. He was tried on both premeditation and felony murder theories, and the jury returned a general verdict of guilty. We affirm Bouwkamp's conviction. The state's premeditation argument, however, does not adequately distinguish the elements of first and second degree murder. The court will comment on this distinction to provide guidance in this critical area of the law.

Bouwkamp presents three issues in his appeal:

I. By refusing to give appellant's theory of the case instruction to the jury, the trial court violated his constitutional right to due process.

II. Instruction 15 should not have been given in this case, and should no longer be the Wyoming rule of law, because:

1] the rationale supporting the felony murder doctrine is not served by this instruction;

2] a strict application of this rule led to a harsh and incorrect verdict in this case; and

3] this rule has the effect of imposing punishment beyond the defendant's culpability.

III. There is insufficient evidence to support the verdict and therefore the trial court erred in not entering a judgment of acquittal for the appellant.

The state responds to these three assertions, rephrasing them as:

I. The trial court properly refused to instruct the jury regarding a crime with which appellant was not charged.

II. Instruction 15 was a proper statement of the law and was supported by the facts in this case.

III. There was sufficient evidence to support the verdict.

## FACTS

In the early morning hours of May 25, 1989, Lucien Millox, a 63–year–old Buffalo area ranch hand, was savagely battered and left to die at a location north of Buffalo known as the Rock Creek interchange. The beating took place on the roadway, and Millox was then stripped partially naked and thrown over a concrete barrier and out of the sight of travellers on the road; he died an hour or two later from brain swelling caused by multiple blunt trauma. On May 26, 1989, a local farmer noticed a large amount of dried blood on the road and a blood trail leading to and apparently over the barrier and stopped to investigate. Following the blood trail he discovered the body, which he immediately reported to the Johnson County sheriff's office. Millox's face was so badly battered that the body was unrecognizable, and fingerprints were needed to identify him. The Johnson County sheriff's office investigated the homicide with assistance from the Wyoming Division of Criminal Investigation and the Wyoming State Crime Lab.

Millox was last seen leaving Buffalo with Bouwkamp and Bouwkamp's employee, D.J. Lennick, after the bars closed early on May 25, 1989. Bouwkamp and Lennick first encountered Millox in a Buffalo bar on the evening of May 24. Bouwkamp, Lennick and Stagner, another employee, had come into Buffalo after work to drink beer and play pool; the three men were staying in the area while building a pole barn a short distance outside of Buffalo. Initially, they went to the 21 Club; it was there they met Millox. Stagner left the 21 Club and crossed the street to the Buffalo Club where a woman he knew was tending bar. Some time later, Lennick and Millox got into a dispute which was resolved without violence. Bouwkamp claimed that Millox pulled a knife on Lennick during this confrontation, but others present did not see one. At Bouwkamp's suggestion, Lennick also went to the Buffalo Club where he remained until it closed.

Some time before the 21 Club closed Bouwkamp and Millox struck up a conversation at the bar and bought each other

drinks. Millox paid for drinks from a pile of bills he had placed on the counter in front of him. When the bar closed Millox asked Bouwkamp for a ride home. Bouwkamp, followed by Millox, went to the Buffalo Club to get Lennick; it was there that Bouwkamp heard about an after-hours party. Millox claimed he knew where to find the party and offered to guide Bouwkamp there. The three left Buffalo in Bouwkamp's shop truck. Millox was killed shortly thereafter.

Bouwkamp admitted he was present when Millox was killed, but claimed he had nothing to do with the killing. In Bouwkamp's version of the subsequent events, the three men left Buffalo in Bouwkamp's truck, with Bouwkamp driving, Millox riding with him in front, and Lennick lying in back on the flatbed. They looked for the party, but could not find it. Bouwkamp testified that after slowly driving a couple of miles out of town while searching for the party, he stopped the truck at the Rock Creek interchange at Millox's request so that Millox could relieve himself. Lennick climbed off the truck and Millox immediately attacked Lennick, again pulling a knife, which Bouwkamp was forced to wrestle from him. Lennick struck Millox several times during this struggle. Bouwkamp testified that, although words were still being exchanged, he believed the incident was over and the other two were under control, and he walked up the ramp to the interstate above to orient himself. However, as he returned he saw the other two exchange blows, Millox fall to the ground, and Lennick stomp on Millox's face.

Bouwkamp testified he then tried to pull Lennick off Millox, but when he grabbed Lennick from behind, the younger and stronger man simply shrugged him off, flinging him to the ground. Lennick, who was intoxicated and in a rage, then threatened Bouwkamp as well, until finally recognizing him and calming down. After calming Lennick, Bouwkamp knelt and checked Millox's condition. He could see that Millox was badly battered and could not find a pulse, leading him to believe that Millox was dead.

Bouwkamp admitted that he decided to attempt to cover up the killing. He and Lennick partially stripped Millox and took his knife, checkbook, watch and belt buckle and some of his clothing, planning to destroy these items to cover up the victim's identity and their involvement in his death. They then dumped what they believed was a dead body over the barrier at the side of the road and tried to remove evidence of their presence from the crime scene. Bouwkamp recalled trying to hide next to his truck during this time when a vehicle drove by. Bouwkamp testified that he did these things out of shock, fear of what would happen to him because he was on probation for a felony car theft, and a desire to protect Lennick.

At about the time the murder occurred, the same farmer who subsequently discovered the body drove through the crime scene as he returned home from a bull sale in South Dakota. He saw what was later identified as Bouwkamp's vehicle, a flatbed truck with Montana plates and a missing taillight, parked in the road under the interstate at the interchange. He also observed a man in a Stetson type hat crouched alongside the truck, apparently hiding his face from view. He did not see anyone else and thought at the time the man might have been relieving himself. He reported this observation to investigators after he discovered the body.

Bouwkamp and Lennick placed Millox's clothing and some of the bloodstained clothing they had been wearing in plastic bags, which they hid in the travel trailer they stayed in at the jobsite. They finished the barn the following day, packed up and returned to their homes in Billings, Montana. Lennick then took Millox's personal items and all the clothing the two had gathered, except for Bouwkamp's boots, from the trailer. He burned the clothing, but gave Millox's knife, watch and belt buckle to his father, apparently after his father asked for them in order to turn them over to Lennick's attorney.

Investigators with a search warrant seized Bouwkamp's truck and travel trailer in Billings. Lennick was arrested on May

29, 1989, and Bouwkamp turned himself in to authorities the following day. Investigators also received Millox's knife from Lennick's attorney, and his watch and belt buckle from another law enforcement agency that had recovered them after they had been stolen from Lennick's father. Bouwkamp's bloodstained boots were found in the trailer and dried blood samples were collected from the spatters found on Bouwkamp's truck. The blood from the boots and truck matched that of the victim, as did hair fragments found in the dried blood on Bouwkamp's boots.

Codefendant Lennick pled guilty to first degree murder before trial and received a life sentence. He testified at Bouwkamp's trial, although he was unable to recall much about the incident apparently because of what was described as an alcoholic blackout. Bouwkamp testified on his own behalf. The jury returned a general verdict of guilty of murder in the first degree.

## THEORY OF THE CASE INSTRUCTION

■ Bouwkamp correctly asserts that due process considerations entitle criminal defendants to affirmatively stated theory of the case instructions when two conditions are met. *Murray v. State*, 776 P.2d 206, 209 (Wyo.1989); *Best v. State*, 736 P.2d 739, 744 (Wyo.1987). The instruction must sufficiently inform the court of the defendant's theory and must be supported by competent evidence. *Id.* However, there is another fundamental condition precedent which was not met by the offered instruction. The instruction must in the first instance be a proper theory of the case, or theory of defense, instruction. That is, the offered instruction must present a defense recognized by statute or case law in this jurisdiction. The instruction Bouwkamp contends was improperly refused did not present such a defense.

■ Bouwkamp's offered instruction describes the crime of accessory after the fact. Suggestion of an alternative charge is not a defense to the crime being prosecuted. It may offer the jury a different way to interpret the facts, but does not present a defense against the murder

charge. Like the defendant in *Ellifritz v. State*, 704 P.2d 1300 (Wyo.1985), Bouwkamp contends the evidence did not prove his guilt of the crime charged. In *Ellifritz*, 704 P.2d at 1301, this court said, "[a] theory of the case is more than a comment on the evidence. What appellant suggests in his proposed instructions is comment on the evidence—in effect, telling the jury how * * * to consider the evidence." *Ellifritz*, 704 P.2d at 1301. This approach, we went on to say, does not state a theory of defense. *Id.* at 1302.

■ Theory of defense instructions are to be derived from and address criminal defenses provided for by statute or acknowledged by this court. "Common-law defenses are retained unless otherwise provided by this act." Wyo.Stat. § 6–1–102(b) (June 1988). Additionally, this court has discussed acceptable defenses, notably in *Keser v. State*, 706 P.2d 263, 269 (Wyo. 1985). *See also* 1 Paul H. Robinson, *Criminal Law Defenses* § 21, 70 n. 1 (1984); 1 Charles E. Torcia, *Wharton's Criminal Law* § 39 (14th ed. 1978). Bouwkamp's "theory of defense" does not state a defense recognized in Wyoming by statute or judicial decision.

■ We note the disputed instruction is apparently taken verbatim from Wyoming Pattern Jury Instructions—Criminal, WPJIC § 3.302, *Elements of Accessory After the Fact.* While reiterating that the WPJIC serves only as a guide for counsel, we observe that it includes two separate parts labelled *Defenses* and *Excused Action* and that this instruction was not taken from either, but instead simply states the elements of an offense.

Bouwkamp did not rely on a defense recognized by Wyo.Stat. § 6–1–102 or this court that would merit a theory of the case instruction. Instead, his true defense was the simplest and most direct of all: he denied guilt of the crime charged. He argued he was not guilty of killing Millox, although he was willing to admit that he helped cover up the murder. In other words, he defended by claiming to be inno-

cent of the crime charged. On this argument he received adequate instructions.

Bouwkamp points out that this court apparently considered an accessory after the fact argument as a theory of defense in *Miller v. State*, 755 P.2d 855 (Wyo.1988). We reject that interpretation. However the *Miller* instruction may have been labelled, it adequately covered that which Miller wished instruction on, while his offered instructions were rejected because they were argumentative and confusing. *Id.* at 865. The *Miller* opinion does not hold that an accessory after the fact argument is a theory of defense to a murder charge, and the opinion should not be so read.

Bouwkamp's offered instruction, which was refused by the court, cannot be considered a theory of the case instruction. Without this characterization it is seen as essentially an attempt to amend the charges. However, as the state asserts, the charging decision lies with the prosecutor and the defendant cannot alter or amend the charges. The refused instruction listed the elements of our accessory after the fact statute [1] and provided for a jury determination of defendant's guilt for that crime. It is a comment on the evidence designed to persuade the jury that while Bouwkamp was guilty of another crime, he was not guilty as charged.

The trial court correctly chose to reject the instruction because it described a crime not charged and one which was not a lesser included offense of murder in the first degree. "It would have been confusing to the jury to be instructed on a crime not charged, and one on which they could not convict." *Miller*, 755 P.2d at 865. Additionally, the trial court had no obligation to give a "correct" version of the proposed instruction as it did not apprise the jury of a recognized theory of defense that would entitle Bouwkamp to an instruction.

■ While Bouwkamp was not permitted this instruction, he was not compromised in arguing his alternative interpretation of the facts to the jury. He did so vigorously, both through his counsel's efforts and through his own testimony as to the events of Millox's death. The jury chose not to believe him. As the rejected instruction did not present a theory of defense to the charge of murder, the trial court did not err in refusing to give it. The court gave the following instruction:

## INSTRUCTION 15

For the purposes of establishing the crime of felony murder, a killing which occurred in the perpetration of a robbery, the sequence of events is unimportant and the killing may precede, coincide with or follow the robbery and still be committed in its perpetration.

Bouwkamp argues that this instruction should not have been given and should no longer be the rule of law in Wyoming. He reasons it does not further the felony murder rationale, it led to an incorrect verdict against Bouwkamp, and its effect is to impose punishment disproportionate to a defendant's culpability. We disagree. The instruction as given accurately states the law, and Bouwkamp has not demonstrated the dire consequences that he alleges flowed from its use.

Felony-murder is an unusual offense in that the death arising out of the robbery is purely an incident of the basic offense. It makes no difference whether or not there was an intent to kill. The statutory law implies all of the malevolence found and necessary in the crime of first degree murder alone.

*Richmond v. State*, 554 P.2d 1217, 1232 (Wyo.1976). Consequently, a defendant convicted under this language faces the same penalties as one convicted of premeditated, that is, coolly calculated murder. The element of deliberation is established by the defendant's presumed consideration of the high degree of risk of causing death involved in the commission of one of the inherently dangerous felonies expressly incorporated into our first degree statute. *Richmond*, 554 P.2d at 1232.

1. Wyo.Stat. § 6–5–202 (June 1988).

In its brief the state acknowledges there may be merit in Bouwkamp's claim that the felony murder rule should not be applied in the instance where the felony arises as an afterthought and is committed subsequent to the murder. The rationale underlying this claim is that the purpose of the rule is to deter homicides in the course of felonies, including those resulting from negligence or accident, by holding the perpetrators strictly responsible. *Richmond,* 554 P.2d at 1232. This purpose does not logically reach the circumstance where the felony is conceived of and executed after the killing has occurred. However, the state then argues that the issue of misapplication of the felony murder rule does not arise from the trial court's giving of Instruction 15 in this case. We agree with both contentions.

■ The key phrase in the instruction, "in the perpetration of," relied on by the state is found in *Cloman v. State,* 574 P.2d 410, 418–21 (Wyo.1978). "Perpetration," as used here, is the act or process of commission of a specified crime. *Webster's Third New International Dictionary* 1684 (1971). To occur in the perpetration of a felony the killing must occur in the unbroken chain of events comprising the felony. *See Cloman,* 574 P.2d at 419–22. In *Cloman* we framed the concept in this way: "the time sequence is not important as long as the evidence, including the inferences, point to one continuous transaction." *Cloman,* at 420. This means that, for a finding of felony murder, the killing must occur as part of the *res gestae* or "things done to commit" the felony. If the felony was not conceived of before the victim's death but occurs after the murder, the chain is broken, and the murder is a separate act which cannot have occurred "in the perpetration of" the underlying felony. *See United States v. Mack,* 466 F.2d 333, 338 (D.C.Cir.1972) *cert. denied sub nom. Johnson v. United States,* 409 U.S. 952, 93 S.Ct. 297, 34 L.Ed.2d 223; *see also Grigsby v. State,* 260 Ark. 499, 542 S.W.2d 275, 280 (1976).

While the sequence of events is not significant, their interrelationship is. A specific connection is required: the murder must occur in the performance of the felony for conviction of felony murder under Wyo.Stat. § 6–2–101 (June 1988).

Instruction 15 requires that, before Bouwkamp could be found guilty of felony murder, the murder must be proved to have occurred in the perpetration of, or during transaction of, the robbery of Millox. Consequently, it does not dictate application of the felony murder rule where both the intent to commit the felony and the act itself follow the murder as a separate transaction, as Bouwkamp contended happened here.

■ Whether the killing and the felony were part and parcel of one transaction is a jury question. Annotation, *What Constitutes Termination of Felony for Purpose of Felony Murder Rule,* 58 A.L.R.3d 851 § 5 (1974). Without doubt it may be difficult to persuade a jury on facts such as these that there were two separate criminal transactions. The jury is not bound to accept a defendant's version of events, *Grigsby,* 260 Ark. at 508, 542 S.W.2d at 280. This jury chose not to believe Bouwkamp's story. We note that the evidence and inferences satisfy the one continuous transaction test imposed by the directive that the murder occur "in the perpetration of" the felony.

■ We expressly reject the suggestion that *Cloman* may be read to permit a conviction for felony murder where intent to commit the felony cannot be inferred before the murder and the chain of events is apparently broken. When a reasonable doubt remains as to whether the felony may have occurred as an afterthought that followed the killing, the killing cannot have been "in the perpetration of the felony," and the homicide may not be elevated to murder in the first degree by application of the felony murder rule. This is our understanding of the legislature's intent. Although the proposition of law may perhaps be stated more plainly, Instruction 15 presents a correct statement of the law, and the trial court did not err in giving it.

## SUFFICIENCY OF THE EVIDENCE

Bouwkamp's final contention is that the evidence presented at his trial was insufficient to support his conviction of murder in the first degree under either the premeditation or felony murder theories argued by the state. Bouwkamp directs most of his argument to the felony murder theory, claiming that there was not sufficient evidence of robbery in light of his alternative explanation of how the victim's body came to be stripped and Lennick's possession of some of Millox's personal effects.

Bouwkamp claimed that Millox's body was stripped of clothing and property after his death only to cover up his identity. However, our reading of the record reveals that the jury had enough evidence and reasonable inferences available to it on which to find that Millox was murdered only after the intent to commit robbery was formed and to effect that purpose.

■■■ To determine whether sufficient evidence of a crime exists, "[w]e examine all the evidence in the light most favorable to the State." *Mendicoa v. State*, 771 P.2d 1240, 1243 (Wyo.1989). *See also Broom v. State*, 695 P.2d 640, 642 (Wyo.1985). In so doing, we note the testimony of Bouwkamp's drinking with Millox while the victim placed his stack of bills on the bar, the travel of the trio to a remote location, the ultimate disappearance of the victim's cash without any explanation, and Lennick's retention of Millox's personal items having utility or value. Our standard of review is not whether the evidence is sufficient for us, but whether, when viewed favorably to the state, it was enough on which a jury could form a reasonable inference of guilt beyond a reasonable doubt. *Mendicoa*, 771 P.2d at 1243. That test is satisfied in this case.

Likewise, we find the evidence of premeditation sufficient. We are somewhat troubled with the evidence of premeditation offered by the state. It is apparent that the hedgerow separating the offenses of first and second degree murder has fallen

into some disrepair, requiring that we do some pruning to restore the boundary.

■■ Wyo.Stat. § 6–2–101 defines murder in the first degree as a killing committed "purposely and with premeditated malice" [or one occurring in the course of a felony or attempted felony]. Wyo.Stat. § 6–2–104 (June 1988) defines murder in the second degree as a killing committed "purposely and maliciously, but without premeditation." As second degree murder is a lesser included offense of first degree murder, *State v. Selig*, 635 P.2d 786, 791 (Wyo.1981), a distinction obviously exists between the charges, which is the element of premeditation required for a finding of murder in the first degree. Another apparent distinction is that first degree murder is a specific intent crime, requiring proof of the element of intent, while second degree murder is a general intent crime, requiring only proof of the element of voluntariness. *Crozier v. State*, 723 P.2d 42, 52 (Wyo. 1986). We conclude premeditation is the specific intent element which distinguishes the two types of murder.

■■ Premeditation, or premeditated malice, should be accorded its ordinary meaning, which has been applied in our decisions for some time. It is the "thinking over, deliberating upon, weighing in the mind beforehand, resulting in a deliberate intention to kill which constitutes the killing murder in the first degree." *Parker v. State*, 24 Wyo. 491, 502, 161 P. 552, 555 (1916). Premeditation may be inferred from the facts and circumstances. *Murry v. State*, 713 P.2d 202, 206 (Wyo.1986); *Goodman v. State*, 573 P.2d 400, 407 (Wyo. 1977).

■■ This court's recent discussions of premeditation have focused on the passage of time required to establish premeditation. *See generally*, *Murry*, 713 P.2d at 206–07. While it is true that no specific or substantial time period is required, there must be evidence of cool calculation beyond the mere *opportunity* to deliberate, such as a demonstrated motive, *State v. Williams*, 285 N.W.2d 248, 268 (Iowa 1979),[2] or leav-

---

2. *See also Buckles v. State*, 500 P.2d 518, 522, (Wyo.1972), *cert. denied*, 409 U.S. 1026, 93 S.Ct.

475, 34 L.Ed.2d 320.

ing an altercation to arm oneself. *Murry,* 713 P.2d at 207. Otherwise, having said an instant is sufficient, we have inadvertently eliminated any principled distinction between the evidentiary requirements for the two degrees of homicide. *See State v. Ollens,* 107 Wash.2d 848, 733 P.2d 984, 987 (1987). "The question is not only, did the accused have time to think, but did he think?" *Williams,* 285 N.W.2d at 268 (quoting *State v. Wilson,* 234 Iowa 60, 94, 11 N.W.2d 737, 754 (1943)).[3]

■ The state does not make a compelling case for premeditation. We are simply reminded of the number of blows delivered, the inference that a weapon of some sort was used, and informed that it would be obvious to anyone that such a brutal attack directed at the head would inevitably cause death. Repeated blows with a weapon evidence purpose and demonstrate malice, but "repeated blows" evidence does not establish premeditation.

■ The state erroneously argues that premeditation can be inferred from the use of a weapon. As we said earlier, this court has held that premeditation may be inferred from the circumstances surrounding the killing. *Murry,* 713 P.2d at 206. This court has never said that the circumstance of a deadly weapon is by itself enough to infer premeditation. What we have said is that "malice may be inferred by the use of a deadly weapon." *Braley v. State,* 741 P.2d 1061, 1069 (Wyo.1987).

■ Neither can the brutality of a fatal attack, in itself, support an inference of premeditation. *State v. Lacquey,* 117 Ariz. 231, 234, 571 P.2d 1027, 1030 (1977); *People v. Hoffmeister,* 394 Mich. 155, 229 N.W.2d 305, 307 (1975). *See* 2 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 7.7(a) at 240 (1986). We have examined decisions from other jurisdictions which appear to bootstrap

malice in the form of savagely administered wounds into premeditation by characterizing it as circumstances attending the killing. *See Heiney v. State,* 447 So.2d 210 (Fla.1984); and *Tooley v. State,* 1 Tenn.Cr. App. 652, 448 S.W.2d 683 (1969). This is inappropriate, and we decline to align Wyoming with these jurisdictions. A sure hazard devolving from the difficulty of establishing premeditation when confronted with a factually heinous crime is that malice tends to assume excessive significance, while the requirement of evidence of preexisting reflection becomes indistinct. We affirm that premeditation remains the defining crux and the distinction which this court will require to uphold a first degree murder conviction.

■ We have taken this opportunity to carefully review our premeditation jurisprudence. We find that heretofore we have not identified and articulated a method for evaluating evidence of premeditation. To clarify what is required on appeal to sustain a conviction of first degree murder and to analyze the evidence presented in this instance, we adopt the three-part framework articulated by the California Supreme Court, applied in California and other jurisdictions. *See People v. Bloom,* 48 Cal.3d 1194, 774 P.2d 698, 705–07, 259 Cal.Rptr. 669, 676–78 (1989); *Williams,* 285 N.W.2d at 268; *Longoria v. State,* 99 Nev. 754, 670 P.2d 939, 941 (1983). *See also,* 2 LaFave & Scott, *supra,* § 7.7(a) at 239. We offer the framework verbatim:

Evidence sufficient to sustain a finding of premeditation and deliberation "falls into three basic categories: (1) facts about * * * what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts

---

**3.** We do not mean to suggest by these comments that this court has not required evidence of premeditation beyond mere opportunity to reflect before it has affirmed convictions of murder in the first degree argued on a premeditation theory. Review of our opinions concerning challenges to the sufficiency of the evidence in

first degree murder convictions based on premeditation demonstrates that additional evidence of a specific intent to kill has been required to sustain convictions. The Wyoming decisions cited throughout this opinion provide representative examples.

about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3) would * * * support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed'; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take [the] victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)."

*People v. Crandell,* 46 Cal.3d 833, 760 P.2d 423, 441, 251 Cal.Rptr. 227 (1988) (quoting *People v. Anderson,* 70 Cal.2d 15, 447 P.2d 942, 949, 73 Cal.Rptr. 550, 557 (1968)) (citations omitted).

[V]erdicts of first degree murder typically [are sustained] when there is evidence of all three types and otherwise require at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3).

*People v. Anderson,* 70 Cal.2d 15, 447 P.2d at 949, 73 Cal.Rptr. at 557.

With reference to the foregoing three basic categories, the first type of evidence we consider is that characterized as planning activity. The evidence is questionable regarding "activity directed towards, and explicable as intended to result in, the killing." Initially, Bouwkamp did not initiate Millox's fatal trip. Instead, Millox left town with Bouwkamp because he had asked Bouwkamp for a ride home. Subsequent travel to an unpopulated stretch of rural road may be explicable as intended to result in the killing, but the location as readily explained by Bouwkamp's knowledge of, and search for, the after-hours party.

■ The state points to the inferred use of a weapon and relies on *Cloman* to make the argument that this is a circumstance from which premeditation can be inferred. However, this is a substantially different case. First, the use of a weapon is only inferred, as no weapon was discovered or even specifically described. We are being asked to endorse an inference upon an inference. Second, the state's suggestion is that the weapon used on Millox was probably a tool or stake taken from the back of the shop truck. Use of a weapon of this nature is not, by any reasonable stretch, evidence of planning. Such an instrument is normally found on a vehicle used in construction, and if such a weapon were used, it is at least as suggestive of spontaneity as of planning. Consequently, the state is not asking this court to infer, but to speculate. *People v. Rowland,* 134 Cal. App.3d 1, 8, 184 Cal.Rptr. 346, 349 (1982). This is distinctly different from the weapon in *Cloman,* a knife apparently concealed on the person of one of the defendants before encountering the victims, and then used to commit the murders. We find no evidence of planning activity.

■ The second category of evidence is that related to the prior relationship of the accused and the victim that suggests a motive or motives to murder the victim. This court has discussed the significance of motive evidence in several earlier first degree murder cases. *Jones v. State,* 568 P.2d 837, 844 (Wyo.1977); *Buckles v. State,* 500 P.2d 518, 523 (Wyo.1972); *Keffer v. State,* 12 Wyo. 49, 69–70, 73 P. 556, 561 (1903).

There is little that suggests animosity between Bouwkamp and Millox. The two interacted for the first time the evening of the murder. They spoke to each other only briefly, near closing time, and that was a friendly conversation, in the course of which they bought each other drinks. At the conclusion of that conversation Millox asked Bouwkamp for a ride home, evidence of their mutual comfort level. Lennick did have some sort of brief altercation with Millox earlier that evening, but Bouwkamp was only peripherally involved.

However, there is evidence of motive for robbery, or avoiding detection for robbery, based on Bouwkamp's observation at the

bar of Millox's roll of bills. Robbery is sufficient motive to justify an inference of premeditation. *Keffer*, 73 P. at 561; *State v. Gordon*, 354 N.W.2d 783, 784 (Iowa 1984); *Ollens*, 733 P.2d at 987.

■ The final category is evidence of the "nature of the killing from which the jury could infer that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design.'" Here there is merit in the state's argument regarding the blows administered to Millox. The exacting application of repeated, severe blows across the face is evidence supporting the inference of a deliberate intent to kill.

■ Returning to the analytical framework, evidence of the nature of the killing to support a finding of premeditation must be supported by reasons reasonably inferred from category (1) or category (2) facts. As robbery is sufficient motive, here support for the evidence of the nature of the killing exists from category (2) evidence, motive.

While the evidence is not overwhelming, we again employ our standard of review for sufficiency of the evidence in a criminal case and find the verdict adequately supported. We consider only whether the jury could find as it did, and not whether we would have reached the same result. *Mendicoa*, 771 P.2d at 1243. Doing so, we find the evidence of premeditation sufficient to support an inference of guilt beyond a reasonable doubt. Our analysis does not reveal evidence from all three categories since we do not identify evidence of planning activity. However, the motive of robbery is present and may properly be coupled with the exacting nature of the fatal blows to Millox's skull to support an inference of premeditation.

We hold that the evidence considered by the jury was sufficient to sustain Bouwkamp's conviction on both felony murder and premeditation theories. As this court recently held in *Price v. State*, 807 P.2d 909 (Wyo.1991), where the evidence is sufficient to support the jury's determination of guilt under either a premeditation or a felo-ny murder theory, we will sustain a general verdict of guilt.

Bouwkamp's arguments are not persuasive, and his conviction is affirmed.

URBIGKIT, Chief Justice, dissenting.

### I.

### ISSUES PRESENTED—BASIC FALLACY OF THE MAJORITY OPINION

This case presents broad and basic issues of Wyoming law: (a) availability of a theory of defense instruction for a criminal defendant; (b) basic nature and application of felony murder; (c) nature of the crime of accessory after the fact; and (d) requirement for jury unanimity in determining its verdict.

Marvin Jay Bouwkamp, II, now serving a life sentence for first degree murder, was convicted for commission of the offense of accessory after the fact, which he admitted and for which he was not prosecuted, and was denied proper opportunity to present his defense of innocence to the charge of aiding and abetting in commission of a homicide, which he emphatically denied. Whether completely innocent or totally guilty of criminal responsibility for the first degree murder, Bouwkamp was denied the constitutional right to adequately defend his claimed innocence of homicide participation.

Errors in conception and misapplication of firmly based criminal principles properly presented by Bouwkamp during his trial, and now considered on appeal, include: (1) denial of a theory of defense instruction in his admission of participation in cover-up activities after the homicide with denial of any actual participation in the death; (2) misapplication of his accessory after the fact admission and testimony to create presumptive proof of guilt of premeditated and felony murder; (3) trial theory development, procedural application and jury instruction which eliminated the requirement that the homicide result from commission of a felony and consequently justified felony murder conviction when the only crime

was conduct as an accessory after the fact following a homicide committed and admitted by his employee; and (4) usage of a single crime jury verdict form for the alternative crimes of either felony murder or premeditated murder eliminating the requirement that the jury reach unanimous agreement on the essential elements proving first degree murder.

## II.

## INTRODUCTION

Bouwkamp's involvement in a terrible tragedy totally unnecessary and absolutely unjustified is not at issue in this appeal. What is presented is his constitutional right and litigative opportunity to properly defend in order that a homicide by another person does not, through presumption from court instruction, result in his incarceration for life for that crime. In my analysis, Bouwkamp was denied an adequate opportunity at trial to defend against the first degree murder charge.

Consequently, I dissent.

In first issue, Bouwkamp asked for a theory of defense instruction which defined his admitted responsibility as an accessory after the fact. He was denied that instruction on the basis now represented by the majority that he was not entitled to such a defense after admitting post-death involvement by denied contributory responsibility when his companion admitted to and pled guilty to the homicide. In my opinion, the claimed instructional error in applying a presumption of participation in the homicide by the occurrence of post-death misconduct improperly contains a presumption of guilt as a basis for conviction. I continue in further disagreement to be disenchanted with the *Cloman v. State*, 574 P.2d 410 (Wyo.1978) dictum to justify alternative guilty jury decision conceptualizations, which elements no longer need unanimity in jury decision. *Price v. State*, 807 P.2d 909 (Wyo.1991), Urbigkit, C.J., dissenting; *Prime v. State*, 767 P.2d 149 (Wyo. 1989), Urbigkit, J., dissenting.

The entire basis of Bouwkamp's defense was in denial that he caused or assisted in the homicide; but that by being present thereafter, he admittedly participated in a cover up which established his criminal activity to be an accessory after the fact. Wyo.Stat. § 6–5–202 (1988). The majority takes Bouwkamp's admitted conduct of being an accessory after the fact and, by use of the transference of time instruction from *Cloman*, "what happened when does not matter," proves guilt of an offense which was denied by the accused. At the same time, Bouwkamp is not permitted to define his theory of defense in jury instruction. The Wyoming Supreme Court comes to this status of prosecutorial preeminence by three interesting observations. The first is guilt admission within the course of events to participation only in post-murder wrongdoing, it is not a defense to the crime prosecuted. The second is " '[i]t would have been confusing for the jury to be instructed on a crime not charged, and one on which they could not convict.' " Maj. op. at 491 (quoting *Miller v. State*, 755 P.2d 855, 865 (Wyo.1988)). And then finally, the sequence of events is unimportant whether the killing precedes, coincides with or follows the robbery to demonstrate required perpetration necessarily involved in felony murder guilt.

By sequential analysis, it is obvious that that course of reasoning reconstructs Wyo. Stat. § 6–5–202, accessory after the fact, into a preemptive co-participant stature in the homicide even though the actual facts in the particular case may be determinably contrary. Wyoming law is applied in a fashion contrary to the legislative intent determined in enactment of Wyo.Stat. § 6–5–202 in its explicit and easily understood and applied provisions. *See Allied–Signal, Inc. v. Wyoming State Bd. of Equalization*, 813 P.2d 214 (Wyo.1991).

A hard look at the components of this majority's syllogism demonstrates it, in text, to be lacking in logic and shaky in foundational precedent. The majority announces that the jury could have convicted Bouwkamp of aiding and abetting in premeditated murder. The simple answer to that is the jury did not make that separate decision. It is more likely that the jury

decided the case based upon the accessory after the fact establishing complicity in the robbery, which then related back to the prior homicide creating felony murder, and then provided the required proof of first degree murder. The second yet simple answer is that no one can actually determine from this record that the jury did not travel down that exact decisional pathway to the first degree murder verdict. This appeal presents anything but a jury decision beyond a reasonable doubt unanimously determining Bouwkamp's guilt of first degree murder.

In characterization, this is a case where Bouwkamp is told there is a constitution and a right to due process in providing the jury his theory of the defense, but not in his case. We recite regularly that for a jury trial, the litigant is provided the right to have jury instructions stating the theory of his case,[1] but Bouwkamp is told, "not in your case." A fundamental rule of criminal conviction in this state is that the accused is entitled to a unanimous verdict as a principle of constitutional law under the Wyoming Constitution before the accused is convicted. W.R.Cr.P. 31 (formerly W.R.Cr.P. 32) identifies "[t]he verdict shall be unanimous," and Wyo. Const. art. 1, § 9 provides the guarantee, but not in this case. Bouwkamp was convicted without requirement that the jury render a unanimous verdict on either his guilt or involvement in premeditated murder as one offense, or felony murder effectuated by intended robbery as another. Finally, the majority has not followed for Bouwkamp the *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979) requirement that a criminal conviction cannot result from usage of a mandatory presump-

tion. This is not a sufficiency of the evidence appeal; structured for consideration are the basic questions of instruction, presumption and verdict form.

Absolutely nothing in this record preclusively demonstrates that Bouwkamp desired, agreed, assisted or supported the homicide or, conversely, that he did not intend to do each and all; except his testimony, which was the only definitive evidence on the subject. *People v. La Belle*, 18 N.Y.2d 405, 276 N.Y.S.2d 105, 222 N.E.2d 727 (1966). Realistically, absolutely nothing in this record establishes, as the case was instructed and the jury verdict submitted, that the conviction was based on anything except the obvious and admitted accessory after the fact conduct following the unexpected and undesired alcoholic-induced blackout precipitated homicide committed by Donald Lennick without reason or pre-planning. In this case, perhaps Bouwkamp deserves a life confinement sentence for his participation in these events of tragedy and alcoholic dysfunctional behavior. I seriously question and comprehensively dissent from justification of the imposition of that retributory punishment by conviction of first degree murder for an event he may not have expected and, in fact, in its commission he may not have participated.[2]

### III.

### THEORY OF A DEFENSE

In order to address this and the following three appellate issues, a factual understanding of the case is required. Bouwkamp, a regularly employed Montana contractor who was working in the area, came to the town of Buffalo, Wyoming and en-

---

1. *McInturff v. State*, 808 P.2d 190 (Wyo.1991), Urbigkit, C.J., concurring in part and dissenting in part; *Ramos v. State*, 806 P.2d 822 (Wyo. 1991); *Oien v. State*, 797 P.2d 544 (Wyo.1990); *Thom v. State*, 792 P.2d 192 (Wyo.1990); *Thomas v. State*, 784 P.2d 237 (Wyo.1989); *Smith v. State*, 773 P.2d 139 (Wyo.1989); *Keller v. State*, 771 P.2d 379 (Wyo.1989); *Prime*, 767 P.2d 149; *Simonds v. State*, 762 P.2d 1189 (Wyo.1988); *Miller*, 755 P.2d 855; *Best v. State*, 736 P.2d 739 (Wyo.1987); *Noetzelmann v. State*, 721 P.2d 579 (Wyo.1986); *Ellifritz v. State*, 704 P.2d 1300 (Wyo.1985); *Stapleman v. State*, 680 P.2d 73

(Wyo.1984); *Scheikofsky v. State*, 636 P.2d 1107 (Wyo.1981); *Goodman v. State*, 601 P.2d 178 (Wyo.1979); *Goodman v. State*, 573 P.2d 400 (Wyo.1977); *Benson v. State*, 571 P.2d 595 (Wyo.1977); *State v. Hickenbottom*, 63 Wyo. 41, 178 P.2d 119 (1947).

2. For a thoughtful and cogent analysis, see Nelson E. Roth & Scott E. Sundby, *The Felony–Murder Rule: A Doctrine at Constitutional Crossroads*, 70 Cornell L.Rev. 446 (1985).

gaged with his employee, Donald Lennick, in an afternoon and evening barroom drinking episode during which they met ranch hand, Lucien Millox. The three continued drinking through the evening and when the bar closed, despite an earlier argument, found themselves leaving to try to find a late night party. In driving away in Bouwkamp's pickup, complicated by their drunken state, the three men became confused and stopped at a highway interchange outside of town where they parked underneath the interstate highway for Millox to answer nature's call and Bouwkamp to try to determine where they were.

For whatever reason while then parked, Lennick and Millox got into a fight resulting in Millox being stomped to death. There were two actual witnesses who survived: Bouwkamp, who testified that he left the immediate scene before the fatal fight erupted to check on top of the highway exchange to determine their location, and Lennick, who testified that he had an alcoholic blackout and did not know what had happened. Bouwkamp testified that he tried to stop the killing when he came back to the vehicle, but was shoved aside by Lennick.

Bouwkamp then testified about his further participation in an effort to hide evidence that might implicate him. There was absolutely no evidence of a predisposition of either defendant to have committed a robbery in advance of the homicide, except subsequent events where Lennick took Millox's property for his use and Bouwkamp took items to conceal his own presence and participation.

It is within this factual scenario that the theory of defense instruction issue was created. With the decisional process utilized by the trial court and factual admissions of accessory after the fact, Bouwkamp's murder conviction, whatever may have been his guilt, was realistically guaranteed.[3] There

is no question about both defendants' responsibility for criminal conduct. What is at issue is Bouwkamp's right to have a properly instructed and directed jury determination whether he committed post-homicide concealment, felony murder, or actually participated in premeditated murder. *Clark v. United States*, 593 A.2d 186 (D.C.App.1991).

There is a strange phenomenon that has developed in recent cases in this jurisdiction where this court has been asked to examine requested theory of defense instructions. Apparently, the majority seems inclined to substitute oral argument for the constitutional and long defined procedural right under Wyoming law to have an instruction as to the litigant/defendant's theory of the case. I categorically reject the concept expressed that "[w]hile Bouwkamp was not permitted this instruction [theory of defense], he was not compromised in arguing his alternative interpretation of the facts to this jury." Maj. op. at 491. Appended to this error is the conception derived in discussion about *Ellifritz v. State*, 704 P.2d 1300 (Wyo.1985). The discussion simply seems to ignore or fails to understand what was meant in *Ellifritz* as the difference between theory of defense and a limiting instruction. Bouwkamp proposed no limiting instruction. His instruction was that he admitted committing an offense, but in no way intended that admission to prove another offense which had occurred earlier. It is just pragmatically untrue to suggest that the entire theory of defense in this case was anything other than recognition of criminal responsibility in an accessory after the fact, but categorical denial of accessory before the fact, aiding or abetting or principal participation in first degree murder. Consequently, the affirmative message of *Ellifritz* clearly demonstrates why the requested instruction in

---

**3.** I do not suggest that a review of the evidence viewed in a perspective most favorably to conviction would not realistically provide factual issues appropriate for jury decision separately on either felony murder or perhaps premeditated murder. One or both offenses with participation of both co-defendants may have occurred. The offenses may have been committed by the co-defendant without act or culpability by Bouwkamp, and those offenses may not have occurred at all where an alcoholic-induced fight started and the loser lost his life in the senseless progression of the brutality of human conduct.

Bouwkamp should have been given. In *Ellifritz*, 704 P.2d at 1302, we said:

The trial court has a duty to instruct the jury on general principles applicable to the case. * * * A defendant has the right to have his theory of the case affirmatively presented to the jury. * * * The trial court has a duty to properly instruct the jury on defendant's theory of the case even though instructions offered by him are "not entirely correct," provided, of course, they are sufficient to apprise the court of the theory of the defense. * * *

The principles that we have set out [above] are only applicable, of course, if there is competent evidence in the record to support defendant's theory of the case. The instructions offered by appellant are not theory of the case instructions. At trial, appellant did not offer these instructions as "theory of the case" instructions; rather, they were offered and refused as limiting instructions. On appeal appellant cannot elevate these offered instructions into "theory of the case" instructions by simply calling them such.

Factually contrary to *Ellifritz*, this is a case where a theory of defense instruction was requested and this majority now turns the request into something else by name redesignation. The instruction did not single out certain evidence, but instead defined a concept relative to the entire body of evidence presented. That is, after all, what a theory of defense instruction is intended to do. The comparable usage of a theory instruction for the benefit of prosecution in *Keser v. State*, 706 P.2d 263 (Wyo.1985) is comparable and illustrative. It is not often when an affirmative defense instruction is utilized as it was in that case to benefit prosecution. Parental discipline justification in *Keser* is structurally no different than sole involvement as an accessory after the fact argued by Bouwkamp.

Without doubt, in the face of the majority's approach to felony murder, temporal relationship and one verdict form for either or both premeditated murder or felony murder, the denial of a theory of defense instruction foreclosed Bouwkamp from his constitutional right to defend. It belies belief that this court can assert that a defendant has a right to defend justifying a theory of defense instruction and then preclusively deny constitutional access to due process by rejection of that theory of defense instruction. The unjustifiable and unsupported assertion that a right to a theory of defense instruction can be replaced by oral argument at the close of the case cannot be authenticated in any other of our nation's courts. Here the constitutional right is denied, but even worse it is denied by an inappropriate and illogical justification for the oral argument substitution. Within the large body of national law involving instructions for the litigants' theory of the case, Wyoming goes alone down the oral argument pathway.

I do not suggest that the proposed instruction process pursued by Bouwkamp, adopted by the trial court, or authenticated by this majority considers an adequately and appropriately worded theory of defense instruction. Overtly, one phrased as: "It is the theory of the defense that the defendant, Marvin Bouwkamp, was guilty of conduct which is defined as the crime of accessory after the fact, which crime is not charged here, but claims innocence of either felony murder or premeditated murder, which are the charges prosecuted," could have been presented and should have been given. *Clark*, 593 A.2d 186; *State v. Gelormino*, 24 Conn.App. 556, 590 A.2d 476, *cert. denied*, 219 Conn. 913, 593 A.2d 138 (1991).

My most strenuous objection to the majority opinion would have been significantly ameliorated if the decision had been based on the argument that right to any theory of defense instruction was waived by failure of counsel to tender a properly phrased instruction for the trial court's consideration. *Delaney v. State*, 14 Wyo. 1, 81 P. 792 (1905). *Surprisingly, no generic defendant's theory of defense (except not guilty by indirection) of any kind was actually given to the jury to aid and instruct their deliberation.* That theory of defendant was, however, defined by the tendered instruction relating to the defense

that Bouwkamp was only involved as an accessory after the fact. The concealment and flight instructions, which were given successively, then converted the contended status of accessory after the fact into instructed evidentiary proof of homicide guilt. Concealment and flight instructions as theories of prosecution were given; the countervailing theory of defense of accessory after the fact was denied. *Cf. Lauderdale v. State*, 555 So.2d 799 (Ala.Cr.App. 1989).

It is clearly apparent that lack of understanding exists as portrayed in the majority about the difference between substantive instruction defining the legal constituency of *a particular defense*, e.g., self-defense in homicide, compared to a statement by instruction of the theory of· defense, e.g., non-presence and alibi. The former defines the legal criteria of a proposed defense; the latter advances reason for defense and cause to consider non-conviction as a matter of guilt determination. *Dice v. State*, 825 P.2d 379 (Wyo.1992); *United States v. Felix–Gutierrez*, 940 F.2d 1200 (9th Cir.1991).

The theory of defendant's case in constructional concept was stated in *People v. Sears*, 2 Cal.3d 180, 84 Cal.Rptr. 711, 717, 465 P.2d 847, 853 (1970) as "a defendant, upon proper request therefor, has a right to an instruction that directs attention to evidence from a consideration of which a reasonable doubt of his guilt could be engendered." *See United States v. Goldson*, 954 F.2d 51, 55 (2d Cir.1992) and *Lybarger v. People*, 807 P.2d 570 (Colo.1991). *See also People v. Mickey*, 54 Cal.3d 612, 286 Cal.Rptr. 801, 818 P.2d 84 (1991). This is the difference between pinpointing and defining legal application. *Best v. State*, 736 P.2d 739 (Wyo.1987). *Cf. Goodman v. State*, 573 P.2d 400 (Wyo.1977). The separate and distinguishable subject of fact-directed argumentative instructions is not presented in this appeal. *People v. Wharton*, 53 Cal.3d 522, 280 Cal.Rptr. 631, 809 P.2d 290 (1991), *cert. denied*, — U.S. —, 112 S.Ct. 887, 116 L.Ed.2d 790 (1992).

My overwhelming concern in this case is caused by the majority's failure in differentiation and consequent justification of why Bouwkamp was not entitled to an instruction on his theory of his case. *Goldson*, 954 F.2d at 55; *Lybarger*, 807 P.2d at 579. The simple instructional statement that Bouwkamp's theory of defense was that he did not participate in the homicide and only became involved as an accessory after the fact, which is a separate crime, would have been a clearly appropriate instruction as a theory of defense. A proper (or improper) proposed instruction has nothing to do with this court's comments:

> Bouwkamp did not rely on a defense recognized by either Wyo.Stat. § 6–1–102 or this court that would merit a theory of the case instruction. Instead, his true defense was the simplest and most direct of all: he denied guilt of the crime charged. He argued he was not guilty of killing Millox, although he was willing to admit that he helped cover up the murder. In other words, he defended by claiming to be innocent of the crime charged. On this argument he received adequate instructions.

Maj. op. at 490–491.

> Theory· of defense instructions are to be derived from and address criminal defenses provided for by statute or acknowledged by this court.

Maj. op. at 490.

> Bouwkamp's offered instruction describes the crime of accessory after the fact. Suggestion of an alternative charge is not a defense to the crime being prosecuted.

*Id.*

These comments simply do not properly address the right of a defendant to a theory of defense instruction since apparently suggesting that only formal "defenses" can be communicated by a theory instruction. To the contrary, it is the reason for non-guilt that is properly included in the theory of defense instruction which, in this proceeding, is a denial of guilt and concurrent explanation of what admittedly happened—accessory after the fact.

The conjunctive confusion in lack of differentiation is highlighted by the further language used in the majority opinion:

However, there is another fundamental condition precedent which was not met by the offered instruction. The instruction must in the first instance be a proper theory of the case, or theory of defense, instruction. That is, the offered instruction must present a defense recognized by statute or case law in this jurisdiction. The instruction Bouwkamp contends was improperly refused did not present such a defense.

Maj. op. at 490. By this language, which intermixed entirely different subjects, Bouwkamp was denied his constitutional right to have the jury advised about the strategical basis upon which his defense was organized and presented.[4]

I take even stronger exception with the stated justification of the majority opinion that oral argument is a proper or adequate substitute for an instruction providing a theory of defense:

> While Bouwkamp was not permitted this instruction, he was not compromised in arguing his alternative interpretation of the facts to the jury. He did so vigorously, both through his counsel's efforts and through his own testimony as to the events of Millox's death.

Maj. op. at 491.

There are no cases cited to support this exceptional proposition regarding adequacy of oral argument as a substitute for proper instruction and none can be found nationwide except possibly in one prior Wyoming case. The real problem in this case is that the accessory after the fact admission, as the case was instructed, preclusively determined guilt, even though the jury might have believed nearly everything that Bouwkamp said in his testimony.

In linguistic terms, we are presented the monumental difference between instruction on the theory of defense presented by Bouwkamp or the presentation of the

terms of a defense in legal character. One involves the overall approach and strategy, *Dice*, 825 P.2d 379; *Sears*, 84 Cal.Rptr. 711, 465 P.2d 847, and the second addresses legal aspects and application of rules of law to define conduct. *Stevenson v. United States*, 162 U.S. 313, 16 S.Ct. 839, 40 L.Ed. 980 (1896). As an example of the explanation by defendant that he was not there would be *the* defense, but not *a* defense defined, created or matured by statute or rules of law.

The actuality of a defense to a criminal charge encompasses three different possibilities. First, in concept, is a simple denial of guilt, e.g., failure of the prosecution to prove the essential elements of the crime charged. The second is offense modification and the third is justification, excuses and non-exculpatory defenses. Within the totality of these categories, there may be a multitude of bars to conviction. A footnote in the well-established definitive text of 1 Paul H. Robinson, Criminal Law Defenses § 21, at 70 n. 1 (1984 & 1988 Supp.) lists more than fifty. That text further outlines appropriately the three categories of "defenses" involved in criminal cases:

> Failure of proof defenses are nothing more than instances where, because of the "defense," the prosecution is unable to prove all the required elements of the offense, the objective conduct, circumstance, and result elements and their corresponding culpability requirements. Offense modifications are similar in that they essentially modify or refine the criminalization decision embodied in the particular offense definition. The remaining three groups of defenses—justifications, excuses, and nonexculpatory defenses—are general defenses; they theoretically apply to all offenses, even when the required elements of an offense are satisfied. They represent prin-

---

**4.** As I hereafter discuss in the section on accessory after the fact, the comment in the majority is substantively wrong since, of course, participation only as an accessory after the fact would be a proper defense; but in this segment, the comment is procedurally wrong since the accused *is always* entitled to an instruction of his theory of defense if viable evidence to support

the theory is provided. *Dice*, 825 P.2d 379. Case law applying the rule is endless in consistent application. *Stapleman*, 680 P.2d 73; 4 Charles E. Torcia, Wharton's Criminal Procedure § 538, at 11 (12th ed. 1976). *Cf. Sellers v. State*, 809 P.2d 676 (Okl.Cr.), *cert. denied,* —— U.S. ——, 112 S.Ct. 310, 116 L.Ed.2d 252 (1991).

ciples of exculpation or defense that operate independently of the criminalization decision reflected in the particular offense. The conduct of a justified actor is not culpable because its benefits outweigh the harm or evil of the offense itself; an excused actor admits the harm or evil but nonetheless claims an absence of personal culpability; and an actor exempt under a nonexculpatory defense admits the harm or evil and his culpability but relies upon an important public policy interest, apart from blamelessness, that is furthered by foregoing the defendant's conviction.

*Id.* at 70–71 (footnote omitted).

In simpler terms, Black's Law Dictionary 378 (5th ed. 1979) states a defense is a response to the claims of the other party, setting forth reasons why the claims should not be granted. The defense may be as simple as a flat denial of the other party's factual allegations or may involve entirely new factual allegations. In the latter situation, the defense is an affirmative defense.

As an itemization of defenses to criminal charges, that resource only lists as samples about fifteen different subjects.

The intrinsic fallacy in the majority argument is contention that a theory of defense instruction is available only if it relates to a properly acceptable affirmative defense, but not if a general denial defense is presented:

Bouwkamp did not rely on a defense recognized by Wyo.Stat. § 6–1–102 or this court that would merit a theory of the case instruction. *Instead, his true defense was the simplest and most direct of all: he denied guilt of the crime charged.* He argued he was not guilty of killing Millox, although he was willing to admit that he helped cover up the murder. *In other words, he defended by claiming to be innocent of the crime charged. On this argument he received adequate instructions.*

Maj. op. at 490–491 (emphasis added). What the majority is stating is that Bouwkamp's theory of defense was unavailable

because he denied guilt. That proposition is totally insupportable in either Wyoming or general law. It is just plain wrong. Equally invalid is the conceptualization that a lesser included offense is required to justify instruction instead of the accessory after the fact to defend against first degree murder. The majority seems to opine that if Bouwkamp's defense raised second degree murder or negligent homicide, a theory of defense instruction became appropriate; but since he denied homicide guilt completely and only recognized after occurrence criminal responsibility, the jury was not entitled to be appropriately instructed. Contrary to the logic of the majority decision, not guilty is always an "acceptable defense" in my opinion. A not guilty theory of defense should be accompanied by the right to have the jury properly instructed regarding the nature of events from which the defense is claimed.

This court, through confined construction and misunderstanding of the appropriate function of a theory of defense instruction, has continuously recognized the rule and simultaneously justified its non-application.[5] This court has gone backwards a long way while continuing to state and then not apply the constitutional right defined in the obligation to permit the defendant to adequately defend by statement in instructions of a theory of defense. *Stapleman v. State*, 680 P.2d 73, 75 (Wyo. 1984).

The subject was well defined in *Stapleman* when this court comprehensively and correctly summarized the prior law of Wyoming and the constitutional concepts generally applied by all American jurisdictions for criminal law:

When an instruction has been offered presenting the defendant's theory of defense, that instruction or a similar instruction must be presented to the jury if it is supported by competent evidence. * * * It is the duty of the court to present to the jury the theory of the defense in his instructions when requested by the defendant. * * * Therefore,

we must look at the record to see if there was competent evidence requiring an affirmative presentation of defendant's theory * * *. [In this case, specific intent to steal necessary to the conviction.] *Id.* at 75. Justice Cardine, in writing the opinion in *Stapleman*, consistently followed the commanding criteria earlier set forth in *Goodman*, 573 P.2d 400 and *Blakely v. State*, 474 P.2d 127 (Wyo.1970).

In more recent time, the occasion to apply this due process principle anchored in American law does not seem to find acceptance in this court. *McInturff v. State*, 808 P.2d 190 (Wyo.1991), Urbigkit, C.J., concurring in part and dissenting in part; *Ramos v. State*, 806 P.2d 822 (Wyo.1991). *See contra Oien v. State*, 797 P.2d 544 (Wyo. 1990); *Thom v. State*, 792 P.2d 192 (Wyo. 1990); *Stuebgen v. State*, 548 P.2d 870 (Wyo.1976) and *Murdock v. State*, 351 P.2d 674 (Wyo.1960). In accord with this court's immediate decision, see *Price*, 807 P.2d 909 and *Prime*, 767 P.2d 149.

Following denial to Bouwkamp of his theory of defense instruction, the second step in his conviction by presumptive instruction was the trial court's application of Instruction No. 15 to which objection was taken. That instruction stated:

> For the purposes of establishing the crime of felony murder, a killing which occurred in the perpetration of a robbery, the sequence of events is unimportant and the killing my precede, coincide with or follow the robbery and still be committed in its perpetration.

Since the defense argued by Bouwkamp was non-complicity in homicide which was followed by his admitted involvement as an accessory after the fact, the non-involvement defense was turned upside down to become a preclusive factor for conviction. In result, Instruction No. 15 took the accessory after the fact admission and defined that since a relative time relationship was unimportant, guilt of murder was established whether or not factually true or false. The instruction given turned into a *Sandstrom* presumption of guilt for the offense of first degree murder. That offense was presumed since the admitted robbery had subsequently occurred.

I reject the majority's approach to deny Bouwkamp the discussion of his theory of defense related to admitted responsibility as an accessory after the fact, which is the next subject to be addressed. We are left without any explanation why a theory of defense instruction in terms similar to what was given in *Miller*, 755 P.2d 855 would not have been appropriate here. *Dice*, 825 P.2d 379; *Oien*, 797 P.2d 544; *Goodman*, 573 P.2d 400; *State v. Hickenbottom*, 63 Wyo. 41, 178 P.2d 119 (1947).

*Since it was the defendant's position that he was only an accessory after the fact, an instruction of that character or providing the same message should have been given as part of the proper instructional process, whether or not suitably requested by Bouwkamp, in order for the jury to understand the decision they were chosen to make. In result, Bouwkamp was denied any theory upon which his defense could be based. The guilt of one crime, which he then admitted, predetermined presumptive guilt for another crime, which he denied.*

## IV.

## ACCESSORY AFTER THE FACT

Case authority on accessory after the fact, Wyo.Stat. § 6–5–202, reveals only one actual appeal where the statute was directly involved. In *Stephens v. State*, 734 P.2d 555 (Wyo.1987), conviction was reversed on a basis of insufficiency of the evidence of criminal conduct by the defendant. The differentiated classification of participants in criminal responsibility was carefully defined in *Jahnke v. State*, 692 P.2d 911, 920–21 (Wyo.1984), although the case was prosecuted as an aiding and abetting case which is a category two in the enumeration provided in the opinion:

> Wyoming has abrogated the common-law distinctions between principal, aider and abettor, and accessory before the fact to felonies. At common law, the parties to a felony were divided into four categories: (1) principals in the first de-

gree—the actor, or actual perpetrator, of the offense; (2) principals in the second degree—those who are present, aiding and abetting the commission of the offense; (3) accessories before the fact—those who are not present at the commission of the crime, but who have counseled, procured or commanded another to commit it; and (4) accessories after the fact—those who, knowing a felony has been committed, receive, relieve, comfort, or assist the felon. * * * Our statute with respect to the first three categories provides that each "may be indicted, informed against, tried and convicted in the same manner as if he were a principal." `Section 6–1–114, W.S.1977 * * *. The result is that differences in the manner of participation by the parties to the commission of a felony do not affect their individual culpability for the crime. Each, whether he is the principal, an aider and abettor, or an accessory before the fact, is treated as a principal for purposes of punishment. Section 6–1–114, W.S.1977.

*Jahnke* further recognized in footnote that the fourth common-law classification, accessory after the fact, was a separate offense under the state statute. *Id.* at 921 n. 3. *See also* 1 William L. Burdick, Law of Crime § 224, at 301 (1946).

*Miller*, 755 P.2d at 864–65 was similarly prosecuted as an accessory before the fact and the instruction given by the trial court stated:

"It is the Defendant's position that he was only an accessory after the fact. The defendant maintains that he did not knowingly counsel, encourage, hire, command or procure the killing of D. Lawrence [sic] DeGroff by Leland Duane Brown. However, once the killing had occurred, the Defendant concedes that he became an accessory after the fact.

"The Defendant is not charged with being an accessory after the fact. If you find that the Defendant did not aid and abet the homicide before the fact, you must find the Defendant not guilty."

In the decision of the *Miller* case, this court determined that the instructions giv-

en adequately explained the defendant's "theory of the case." A defense proposal for an additional paragraph defining the elements of accessory after the fact was rejected for being only "argument on the wisdom of the [charged crime]." *Id.* at 865. The instruction given in *Miller* was essentially what Bouwkamp requested and was denied in this case. Our decision in *Miller* would support the legitimacy of Bouwkamp's request to have an opportunity to define the theory of defense as an instruction in the case. The differentiated involvement of the accessory after the fact issue in *Vialpando v. State*, 494 P.2d 939 (Wyo.1972), as a cause for the grant of a new trial, validates the *Miller* instructional process.

A review of the national precedent provides no basis for rejection of a request to advise the jury of the nature of this particular defense. No question existed about criminal conduct after the homicide had occurred; the question was participation by Bouwkamp as an actual perpetrator, an aider and abettor or an accessory before the fact which would provide a criminal responsibility identical with the principal. Conversely, an accessory after the fact within Wyoming law faces a far less severe punitive responsibility. First degree murder carries a mandatory life sentence while the penalty for violation of the accessory after the fact statute, if the principal offense was a felony, presents a maximum of three years imprisonment, a $3,000 fine, or both. Wyo.Stat. § 6–5–202(b)(i).

The majority correctly assesses that accessory after the fact is a completely independent crime, *Miller*, 755 P.2d 855; *Jahnke*, 692 P.2d at 921 n. 3; *Vialpando*, 494 P.2d 939; *People v. Zierlion*, 16 Ill.2d 217, 157 N.E.2d 72 (1959), and also is not a lesser included offense for the principal perpetrator's crime. *State v. Key*, 411 S.W.2d 100 (Mo.1967). However, the majority does not recognize generally in its discussion that it is a question of fact whether the participation of the charged individual exposed him to the culpability level of punishment as a principal or only as an accessory after the fact. *State v. Sullivan*, 77 N.J.Super. 81, 185 A.2d 410

(1962). It was that factual issue which was intrinsically woven into the defenses presented by Bouwkamp to deny guilt of either felony murder or premeditated murder, either as a principal, as a co-participant in being an accessory before the fact or for an aiding and abetting status. *Id. See also State v. Nordahl,* 208 Mont. 513, 679 P.2d 241 (1984). *Cf. Lauderdale,* 555 So.2d 799.

Lacking an instruction on the subject similar to what was used and approved in *Miller,* there was no way the jury could understand the nature of Bouwkamp's defense. Furthermore, lacking the instruction, evidence proposed to support Bouwkamp's acquittal on first degree murder became prosecutorial ammunition to convict him for first degree murder. A theory of defense instruction was absolutely critical to even achieve jury consideration of his defense, whether then to be accepted or rejected, which is a matter for the jury's fact finding providence. A factual issue for his defense was foreclosed in effect by directed verdict from denied instruction and constitutional error, both preemptive in the nature of *Sandstrom,* 442 U.S. 510, 99 S.Ct. 2450. Both were violative of due process, and denial of any realistic right to defend resulted. Guarantee of both state and federal constitutions were unrecognized and unafforded. Although derived from a somewhat different factual situation, the basic principle was well addressed in *State v. Thomas,* 325 N.C. 583, 386 S.E.2d 555, 561 (1989):

A defendant may always show by the evidence not only his innocence under the theory of prosecution chosen by the State but also his possible guilt of some lesser offense. If this lesser offense is included in the crime charged in the indictment and if there is evidence to support it, the defendant is entitled to have it submitted to the jury. These different theories of defense cannot be abrogated by the State's decision to prosecute nor the trial court's decision to submit the case on only one prosecutorial theory when under the indictment and the evidence adduced another is more favorable to the defendant. To hold otherwise

would raise serious constitutional questions under at least the Due Process Clause in the federal document and its counterpart in our state constitution.

Of course, accessory after the fact is a completely different and sequentially distinct offense from conspiracy, aiding and abetting, or accessory before the fact participation in the principal crime. *Key,* 411 S.W.2d 100; *Nordahl,* 679 P.2d 241. Here, the initiating offenses were felony murder or premeditated murder. Further, it is clear that accessory after the fact would not be a lesser included offense of either felony murder or premeditated murder. 21 Am.Jur.2d *Criminal Law* § 174, at 332 (1981).

The accessory after the fact is one who, with knowledge of the other's guilt, renders assistance to a felon in the effort to hinder his detection, arrest, trial or punishment. There are four requisites: (1) A felony must have been committed by another, and it must have been completed prior to the act of accessoryship, although it is not necessary that a formal charge shall have been filed against the principal felon before this time; (2) the accessory must not himself be guilty of that felony as a principal; (3) he must do some act to assist the felon personally in his effort to avoid the consequences of his crime; and (4) this assistance must be rendered with guilty knowledge of the felony.

Rollin M. Perkins & Ronald N. Boyce, Criminal Law ch. 6, at 748–49 (3d ed. 1982) (footnotes omitted).

Although an accessory after the fact is ordinarily not present when the felony was committed, his absence is not required. Thus, a person who was present when a felony was committed, but in no way aided or abetted its commission—and hence did not qualify as a principal in the second degree—may become an accessory after the fact by rendering aid to the felon thereafter in order to facilitate his escape.

A person does not become an accessory after the fact merely by knowing and failing to disclose that another person

has committed a felony; nor does he become an accessory after the fact by failing to apprehend the felon or by approving of the felony. It must be shown, in addition, that he rendered aid to the felon.

Since an accessory after the fact renders aid to a felon after the underlying felony has been completed, he cannot be regarded as having caused the felony to be committed.

1 Charles E. Torcia, Wharton's Criminal Law § 33, at 170–71 (14th ed. 1978) (footnotes omitted).

This case law is identically incorporated into the Wyoming accessory after the fact statute. Wyo.Stat. § 6–5–202(a) states:

A person is an accessory after the fact if, with intent to hinder, delay or prevent the discovery, detection, apprehension, prosecution, detention, conviction or punishment of another for the commission of a crime, he renders assistance to the person.

The proposed instruction which had been submitted by Bouwkamp accurately reflected Wyoming statute, the state of the law, and his specific theory of defense relating to his contention in admission of what he did and defense that he did not participate by assistance or conduct in either the crime of premeditated murder or felony murder. The case law demonstrates that an aider or abettor may be tried and convicted as a principal, *Tompkins v. State*, 705 P.2d 836 (Wyo.1985), *cert. denied*, 475 U.S. 1052, 106 S.Ct. 1277, 89 L.Ed.2d 585 (1986); *Lisenby v. State*, 260 Ark. 585, 543 S.W.2d 30 (1976); *State v. Lashley*, 233 Kan. 620, 664 P.2d 1358 (1983); *People v. Bills*, 53 Mich.App. 339, 220 N.W.2d 101 (1974), *rev'd on other bases*, 396 Mich. 802, 238 N.W.2d 29 (1976), and conversely, any accessory after the fact commits an entirely different crime. Bouwkamp's proposed defense should have been recognized and submitted by instruction on that basis for jury decision. *See State v. Rider*, 229 Kan. 394, 625 P.2d 425, 432 (1981); *Nordahl*, 679 P.2d 241; and *Sullivan*, 185 A.2d 410. See, however, the mere presence rule in *United States v. Zimmerman*, 943 F.2d 1204 (10th Cir.

1991); *United States v. Longoria*, 569 F.2d 422 (5th Cir.1978); *Gordon v. State*, 533 P.2d 25 (Alaska 1975); *State v. Sims*, 99 Ariz. 302, 306–08, 409 P.2d 17, 20 (1965), *cert. denied*, 384 U.S. 980, 86 S.Ct. 1880, 16 L.Ed.2d 691 (1966), "[u]nquestionably, in the absence of preconcert, the mere presence of a person at the time and place of a crime does not make an aider, abettor or a principal;" and *James v. State*, 144 Tex. Crim. 126, 161 S.W.2d 285 (1942), which recognized a possibility of the innocence in the principal offense and sequentially subsequent involvement in another crime. *See also State v. Truesdell*, 620 P.2d 427 (Okl. Cr.1980). Adequate and seemingly unanimous support for the validity of Bouwkamp's theory of defense is established in the relevant cases. *Zierlion*, 157 N.E.2d 72.

*People v. Karst*, 118 Mich.App. 34, 324 N.W.2d 526, 529 (1982) provides the factual resolution content addressed by Bouwkamp as a component by which the jury should have been directed to consider his theory of defense:

To be convicted as an aider and abettor, a defendant must either himself possess the required intent to commit the substantive offense or participate while knowing that his co-participant possessed the requisite intent. *People v. Triplett*, 105 Mich.App. 182, 306 N.W.2d 442 (1981). Either a defendant's intent or his knowledge that his co-participant had the necessary intent may be inferred from circumstantial evidence. *Id.*, [at] 188, 306 N.W.2d 442. However, a defendant's mere presence at the scene of a crime is not enough, in and of itself, to make him an aider and abettor[.]

\*      \*      \*      \*      \*      \*

On the other hand, it is clear that an accessory after-the-fact is not an aider or abettor \* \* \* [.]

\*      \*      \*      \*      \*      \*

Further, it is error to instruct a jury that a defendant might be guilty as a principal of an offense if he was an accessory after-the-fact. \* \* \*

The distinction between aiders and abettors and accessories after-the-fact is not always clear, and, given the facts, even less so in this case. Acts under-

taken subsequent to the commission of a breaking and entering do not necessarily limit a defendant's liability to that of an accessory after-the-fact, as consideration must be taken of the intent of the actors. It is a question of fact whether a particular act or crime committed was fairly within the intended scope of the common criminal enterprise or was concerned with the commission of the offense.

The accused cannot be convicted of being an accessory after the fact if actions consisted of acting as an accessory or accomplice to the offense. *State v. Williams*, 229 N.C. 348, 49 S.E.2d 617 (1948); *People v. Cooper*, 53 Cal.3d 1158, 282 Cal.Rptr. 450, 811 P.2d 742 (1991).

This majority ignores and misapplies accessory after the fact theory and law by a distillation which denies Bouwkamp his opportunity to defend the first degree murder charge which he faced. *La Belle*, 222 N.E.2d 727. The standard that should be followed was recently stated in *Davis v. State*, 586 So.2d 817, 819 (Miss.1991):

> It equally matters not that the evidence overwhelmingly establish that the defendant is guilty of other offenses. We may not affirm unless the evidence adequately undergirds conviction of the particular offense for which the accused has been indicted and tried.

*See also State v. Jewell*, 104 N.C.App. 350, 409 S.E.2d 757 (1991) (which determined that an accessory after the fact charge could be joined in criminal prosecution as a separate charge with the principal offense, but the defendant could not be convicted of both at the same time); *Com. v. McFadden*, 448 Pa. 146, 292 A.2d 358 (1972); and *Jones v. Com.*, 208 Va. 370, 157 S.E.2d 907 (1967). *Cf.* Gary E. Perlmuter, Note, *Excluding an Accessory After the Fact From a Felony–Firearm Conviction*, 37 Wayne L.Rev. 1951 (1991).

## V.

## CAUSAL AND TEMPORAL RELATIONSHIPS BETWEEN THE FELONY AND RESULTING HOMICIDE

There is a further infirmity in the instructional process of this case and this majority's confirmatory decision. It arises from the *Cloman*, 574 P.2d 410 concept that temporal relationship is unimportant by instruction regarding the causal relationship between the felony and the homicide. The practical mistake is that, in fact, a causal connection constituting more than accident or coincidence *is required* and the temporal relationship is a relevant factor to the causal determination. To state otherwise is to ignore the fundamental basis of felony murder recently addressed by the United States Supreme Court in *Schad v. Arizona*, —— U.S. ——, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991), and even more recently by the New Mexico Supreme Court in *State v. Ortega*, 112 N.M. 554, 817 P.2d 1196 (1991). *See* John Calvin Jeffries & Paul B. Stephan, *Defenses, Presumptions, and Burden of Proof in the Criminal Law*, 88 Yale L.J. 1325, 1383 (1979) and Herbert Wechsler & Jerome Michael, *A Rationale of the Law of Homicide: I*, 37 Colum.L.Rev. 701, 723 (1937).

The case law and legal literature regarding felony murder is near endless. *See Engberg v. Meyer*, 820 P.2d 70 (Wyo.1991), Urbigkit, C.J., dissenting in part and concurring in part. Perhaps as many as a hundred or more law journals could be listed and the individual cases number in the thousands.[6] One of the most thoughtful cases comes from New Mexico in *Ortega*, 817 P.2d at 1201:

> "Few legal doctrines have been as maligned and yet have shown as great a resiliency as the felony-murder rule. Criticism of the rule constitutes a lexicon of everything that scholars and jurists can find wrong with a legal doctrine: it has been described as 'astonishing' and 'monstrous,' an insupportable 'legal fiction' [citing *State v. Harrison*, 90 N.M. 439, 442, 564 P.2d 1321, 1324 (1977) ], 'an unsightly wart on the skin of the criminal law,' and as an 'anachronistic remnant' that has ' "no logical or practical basis for existence in modern law." ' "

---

**6.** Westlaw counts 9,188 cases by a term search.

Roth & Sundby, *The Felony–Murder Rule: A Doctrine at Constitutional Crossroads,* 70 Cornell L.Rev. 446, 446 (1985) (footnotes omitted) * * *. As indicated in this passage, dissatisfaction with the felony-murder doctrine has been widely expressed by both courts and commentators.[7]

Within the totality of the law, whether derived from Justice Souter writing for the plurality in *Schad,* Justice Scalia writing the special concurrence, or Justice White in dissent, or anywhere else in the ocean of words, there is a ratio decidendi for felony murder defined as transferred intent. Simplistically, commission of the felony provides the mens rea to substitute for the premeditation required otherwise for first degree murder. This is the reason that, dependent upon jurisdiction, the kind of felony—or in some states the kind of felony murder—determines the mens rea factor whether the felony commission is sufficient to make the felony murder into a capital or first degree murder offense. *See* Herbert Wechsler & Jerome Michael, *supra,* 37 Colum.L.Rev. 701 and Rollin M. Perkins, *A Rationale of Mens Rea,* 52 Harv.L.Rev. 905 (1939). *See also People v. Lee,* 234 Cal.App.3d 1214, 286 Cal.Rptr. 117, 121 (1991) and *People v. Phillips,* 64 Cal.2d 574, 51 Cal.Rptr. 225, 414 P.2d 353 (1966).

The mens rea—intent—state of the mind in commission of the felony serves to transfer first degree murder guilt from the felony to any resulting homicide. This logical progression demonstrates why the dicta in *Cloman* or the cases cited in support do not provide a foundationally firm legal principle to be applied without relevancy and legitimacy in every case where there was a felony and there was a homicide and nothing more. The mens rea of the felony has to relate to the event of homicide in a relational fashion. Leslie G. Sachs, Note, *Due Process Concerns and the Requirement of a Strict Causal Relationship in Felony Murder Cases: Conner v. Director of Division of Adult Corrections,* 23 Creighton L.Rev. 629 (1990).

The viciousness of any arbitrary and illogical rule is clearly demonstrable here. If we assume, as we should, for a theory of defense perspective that the only—and sole—criminal activity of Bouwkamp was committed as an accessory after the fact, then to approve conviction of first degree murder, we have to reconstruct what the offense of accessory after the fact really is in order to utilize its separation, both in time and conduct arbitrarily to create a mens rea for guilt of a potential capital offense first degree murder.

If the time sequence is unimportant, then the unwitting activity of the innocent doctor in assisting John Wilkes Booth after the President Lincoln assassination properly created a death penalty responsibility. The harborer, assistor, and the family protector, if covered by the accessory statute, even though the conduct occurs some substantial time later—weeks or even years—then becomes guilty of the felony murder and consequently, at least academically,

**7.** In recognizing the applied vengeance and the prescriptive character of the statute for New Mexico, that court appended upon the presumptive malice a requirement of intent to kill. *Ortega,* 817 P.2d at 1211. Contrarily, the direction recently taken with the major change in membership in the California Supreme Court has provided the opposite direction. *People v. Anderson,* 43 Cal.3d 1104, 240 Cal.Rptr. 585, 742 P.2d 1306 (1987), *overruling Carlos v. Superior Court of Los Angeles County,* 35 Cal.3d 131, 197 Cal.Rptr. 79, 672 P.2d 862 (1983). I would confidently expect that New Mexico now leads the way for mature and constitutionally consecrated jurisdiction within the American legal landscape. It is thoughtfully recognized in a variety of scholarly articles that, except in a minority of cases, felony murder defines a determined intent or predisposed willingness to kill. Felony murder in most cases simply serves to be a mechanism to reduce the burden of proof, but not to change the circumstance of intentional killing. *Engberg,* 820 P.2d 70 (Urbigkit, C.J., dissenting in part and concurring in part). Most homicides have an associated felony and few felony murders present a truly accidental killing. It is the wrong cases that provide the exceptions. *See Engberg,* 820 P.2d at 157–59 nn. 42 & 43 (Urbigkit, C.J., dissenting in part and concurring in part). *See also People v. Lee,* 234 Cal.App.3d 1214, 286 Cal.Rptr. 117, 121 (1991) (quoting *People v. Phillips,* 64 Cal.2d 574, 582, 51 Cal.Rptr. 225, 414 P.2d 353 (1966)) recognizing that " '[o]nly such felonies as are in themselves "inherently dangerous to human life" can support the application of the felony-murder rule.' "

subject to the same punishment as the principal, which could be death. We regress by this illogical rationale to the totalitarian societal application of instant death for assistance in escape.

In *Cloman,* the evidence demonstrated that the robbery and homicides were intrinsically related as a single cause of conduct initiated by intent to rob. Herein, within the theory of Bouwkamp's defense, the same single unit of behavior cannot similarly be applied. Consequently, the temporal, unimportant instruction in *Cloman* could not mislead the jury, although here it becomes a directed verdict on a factual issue against Bouwkamp. We have in effect a *Sandstrom* presumption by disregarding the otherwise proof of cause requirement.

I have never believed that presumptions should ever constitutionally be used to replace proof of fact as a thesis of criminal law. Obviously, *Sandstrom* developed from the same recognition that the shortcut by presumption can obviate the proof of required element of the offense fits precisely into my dissenting objection in this case to a broad statement used to override requirement for a proper jury inquiry and consequent factual decision.[8]

Within some jurisdictions, this status has been detailed within a res gestae structure of description. One of the excellent sources of discussion is *State v. Fouquette,* 67 Nev. 505, 221 P.2d 404, 416–17 (1950), *cert. denied,* 341 U.S. 932, 71 S.Ct. 799, 95 L.Ed. 1361 (1951), *cert. denied,* 342 U.S. 928, 72 S.Ct. 369, 96 L.Ed. 691 (1952):

> When a killing is done in the perpetration or attempt to perpetrate robbery, or any other of the enumerated felonies, it is not essential for the state to prove that it was willful, deliberate, and premeditated. * * *
>
> * * * * * *
>
> When the homicide is within the res gestae of the initial crime, and is an emanation thereof, it is committed in the perpetration of that crime in the statutory sense. * * *
>
> The res gestae embraces not only the actual facts of the transaction and the circumstances surrounding it, but the matters immediately antecedent to and having a direct causal connection with it, as well as acts immediately following it and so closely connected with it as to form in reality a part of the occurrence.

Differing from the theory of Bouwkamp that his participation was as an accessory after the fact, the Nevada Supreme Court further explained:

> In this case, the murder was clearly within the res gestae of the robbery, because it was so connected and associated with the robbery as to virtually and effectively become a part of it. Under no possible theory can it be properly said that the murder was committed as an independent act disassociated from the robbery. It is certain, therefore, that the murder was committed in the perpetration of the robbery, within the true intent and fair meaning of the statute[.] * * *
>
> It makes no difference in this case whether appellant unintentionally killed the deceased, as he claims, or whether the killing of deceased by appellant was

---

8. Long before *Sandstrom,* this court also, in a murder case which reversed a conviction based on a presumptive instruction, stated in part: "Every person possessed of a sound mind is presumed to intend and contemplate the necessary, and even probable, consequences of his deliberate act," *Johnson v. State,* 8 Wyo. 494, 58 P. 761, 764–65 (1899), from which, by categorical rejection, the court established:

> This statement of the law cannot be sustained. A conclusive presumption cannot arise in such a case upon any material question until all the evidence bearing upon it is considered, and the proof found to be beyond reasonable doubt. And then, the intent is merely an inference from the facts in evidence, and it is somewhat misleading to speak of it as a presumption at all. The effect of the instruction is to select a part of the evidence bearing upon the question, and to inform the jury that it alone is proof beyond reasonable doubt of the defendant's intention to kill the deceased, and that all other evidence bearing upon the subject is to be excluded from their consideration. To hold that a militiaman in a sham battle, who deliberately points and fires his gun at a vital part of the body of his friend in the opposing line, and kills him, cannot be heard to say that the ball cartridge found its way into his gun by fraud or misadventure, would be as absurd as it would be barbarous. *Id.* 58 P. at 765.

intentional, as the jury might well have found, because one who kills another in the perpetration or attempt to perpetrate any arson, rape, robbery, or burglary, is guilty of murder in the first degree by force of the statute * * *, regardless of any question whether the killing was intentional or unintentional.

*Id. See also State v. Wooten,* 295 N.C. 378, 245 S.E.2d 699 (1978).

Unfortunately, the *Cloman* rule, when applied in this case, essentially advertised that it is unimportant whether the felony is within the interrelated events causing the homicide. Use of the characterization res gestae may either create a play on words or present a concept without reality in definition. It all depends on how the res gestae in whichever characterization is to be defined. Is it time defined, cause defined, or even place defined? Or is it anything that just happened?

As recognized in 2 Charles E. Torcia, Wharton's Criminal Evidence § 288, at 233 (14th ed. 1986): "It is clear, then, that there is no way whereby the scope of the res gestae rule may be defined with precision."

Although the vagaries in the use of the term "res gestae" have been frequently criticized, as in *United States v. Matot* (1944, CA2 Vt) 146 F.2d 197, there seems to be little indication that its meaning will be clarified in the future, no doubt because of the academic character of the problem, and also because of the weight and influence of prior decisions.

*Id.* at 234 n. 38. As the footnote further recognizes, this vagueness and imprecision in the term has caused its removal from modern rules of evidence as a definitional term. In evidentiary terms, the rule has been stated:

The *res gestae* has been defined as those circumstances which are the undesigned incidents of a peculiar litigated act and which are admissible when illustrative of such act. The incidents may be separated from the act itself by a lapse of time more or less appreciable. However, they must stand in immediate causal relation to the act. They are admissible, though

hearsay, because, from the nature of things, *it is the act that creates the hearsay, and not the hearsay the act.*

*Kuether v. Kansas City Light & Power Co.,* 220 Mo.App. 452, 276 S.W. 105, 110 (1925) (emphasis added).

The invalidity of the characterization as a term for felony murder rules as derived from an evidentiary concept is certainly highly exacerbated when the term is applied to define the relationship of discreet events occurring within a continuum of time and complexity of causes and from differentiated intents. Judge Hand best explained in a case involving the accused's theory of defense where intent was an issue:

The prosecution seeks to defend the exclusion on the theory that the testimony would have been "self-serving," and that it was not part of the "res gestae." What else but "self-serving" the testimony of an accused person on his direct examination is likely to be, we find it difficult to understand; and as for "res gestae," it is a phrase which has been accountable for so much confusion that it had best be denied any place whatever in legal terminology; *if it means anything but an unwillingness to think at all, what it covers cannot be put in less intelligible terms.*

*United States v. Matot,* 146 F.2d 197, 198 (2nd Cir.1944) (emphasis added).

Edward J. Imwinkelried, Paul C. Giannelli, Francis A. Gilligan & Fredric I. Lederer, Courtroom Criminal Evidence § 1202, at 283 (1987) states: "*Res gestae* is such a vague expression that it would be better if neither attorneys nor courts used the expression." Consistent in this recognition, the Maine court after quoting from 6 Wigmore, Evidence § 1767 at 255 (Chadbourn rev. 1976) in *State v. Hafford,* 410 A.2d 219, 220–21 (Me.1980), recognized:

Although many of our pre-Rules cases have in terms discussed the "*res gestae* exception," * * * and although Rule 803(2) [Maine's rule of evidence] was intended to codify the decisional law as developed in that line of cases, * * * the drafters of our Rules of Evidences spe-

cifically avoided using the term *res gestae* in order to expunge that phrase from our Maine law of evidence. * * * Continued use of that label by the bench and bar would serve only to confuse and mislead.

The real issue for analysis in this case in accord with the theory of defense and the testimony of the defendant is how does an accessory after the fact fall into inclusion or exclusion of res gestae? The softness of the conceptional definition and its indefiniteness in application, as recognized above, generally caused abandonment of the term for use in criminal law as a specificity determinant. The term means whatever, or perhaps nothing really determinable. Judge Hand was emphatically correct in dissection in *Matot*, 146 F.2d at 198. Res gestae technically, as converted from Latin to English, means "things done," Webster's Ninth New Collegiate Dictionary 1003 (1986), but is used to describe variably the facts that form the environment of a litigated issue to the whole of the transaction under investigation. Black's Law Dictionary, *supra*, at 1173. *See also Case v. Vearrindy*, 339 Mich. 579, 64 N.W.2d 670 (1954) and *Knapik v. Edison Bros., Inc.*, 313 S.W.2d 335 (Tex.Civ.App.1958). *See* Kathryn Annette King, Comment, *The Res Gestae Doctrine: Manifestations in the Common Law of Alabama and Its Role Under the Federal Rules of Evidence*, 42 Ala.L.Rev. 1363 (1991).

Perhaps the most rational description in understandable terms when considered for evidentiary admissibility purposes is that within the res gestae, a statement is part of the transaction and not about the transaction. Although res gestae is not now included as a term within W.R.E. 803, the predecessor authority of the court in *Johnson v. State*, 8 Wyo. 494, 58 P. 761 (1899) found the delineation in having sprung out of the principal fact and under the direct and immediate influence of the transaction.

It is patently obvious that an accessory after the fact criminal activity cannot be fit into these descriptions. In *State v. Kump*, 76 Wyo. 273, 301 P.2d 808, 815 (1956), this court quoted *Chicago City Ry. Co. v. Uhter*, 212 Ill. 174, 72 N.E. 195, 199 (1904): " 'That which occurs before or after the act is done is not a part of the res gestae, although the interval of the separation is very brief.' " In the *Kump* case, a bad attitude toward the victim in advance of the homicide, as repeated from prior statements, was not contemporaneous. "They did not illustrate that act of homicide. The transactions, or acts, were entirely separate and distinct and were erroneously admitted in evidence." *Kump*, 301 P.2d at 815. I find the same principle still persuasive which serves to abjure usage of a res gestae temporal materiality principle espoused here. Causal relationship is absolutely required and the temporal status has a specific connection to the factually determined causal relationship.

If the status of involvement is that of an accessory after the fact by definition, the conduct is separate and distinct. Otherwise, the conduct was either as a principal or in aiding and abetting with the responsibility as a principal. Wyo.Stat. § 6–1–201 (1988) is defined as accessory before the fact.[9] *Jewell*, 409 S.E.2d 757. In looking at the required causal relationship between a homicide and a felony, we are not involved in Bouwkamp with the consideration of a cover-up homicide to conceal commission of a felony. That character of crime is illustrated by *Conner v. Director of Div. of Adult Corrections, State of Iowa*, 870 F.2d 1384 (8th Cir.), *cert. denied*, 493 U.S. 953, 110 S.Ct. 363, 107 L.Ed.2d 350 (1989); *Conner v. State*, 362 N.W.2d 449 (Iowa 1985); and *State v. Conner*, 241 N.W.2d 447 (Iowa 1976). In the cases, the contributory relationship is recognized as homicide committed in conjunction with the commission of a felony, *Conner*, 870 F.2d at 1387;

---

**9.** The differentiation between accessory before the fact and accessory after the fact is demonstrated not only from the significant difference in punishment provided, but also from location in the code where accessory before the fact is a liability statute as compared to accessory after the fact which constitutes the offense in itself. The first statute is included in the general section, Chapter 1, and the second in a section of the Wyoming statutes relating to offenses against public administration as a category of discreet crimes, Chapter 5.

aiding and abetting in the robbery and to conceal the rape and robbery, *Conner*, 241 N.W.2d 447; and murder committed in perpetration of the felony so that the killing was a material part of the felony, *Conner*, 362 N.W.2d 449.

This majority now turns the principle illustrated by the *Conner* cases upside down in restating a later felony committed to have a res gestae relationship with the original homicide earlier completed. Within the theory of defendant's case and testimony, where he had no part in commission of the homicide at all, the subsequent accessory after the fact simply does not create the structure or the connexity required for felony murder.

The basic support for the felony murder principle results from the transference of that mens rea from the felony to the resulting homicide and the thesis cannot be applied to a circumstance where a felony is committed without preplanning after the killing was completed. In simplistic terms, the inquiry is whether the homicide resulted from a commission of the felony and not whether a felony occurred after the homicide was completed. The Wyoming statute, in itself, would seem to be self-defined in clear terms:

> (a) Whoever * * * in the perpetration of, or attempt to perpetrate, any sexual assault, arson, robbery, burglary, escape, resisting arrest or kidnapping, kills any human being is guilty of murder in the first degree.

Wyo.Stat. § 6–2–101 (1991 Supp.).

This statute cannot be overlaid upon the accessory after the fact statute:

> (a) * * * with intent to hinder, delay or prevent the discovery, detection, apprehension, prosecution, detention, conviction or punishment of another for the commission of a crime, he renders assistance to the person.

Wyo.Stat. § 6–5–202. The actual test is homicide in perpetration of the felony. *Moore v. Wyrick*, 766 F.2d 1253 (8th Cir. 1985), *cert. denied*, 475 U.S. 1032, 106 S.Ct. 1242, 89 L.Ed.2d 350 (1986). *See also Spivey v. State*, 114 Ark. 267, 169 S.W. 949 (1914) where the victim's written note, pre-

homicide, surmised that he was about to be invited to his own assassination. The note, in text, was not admissible as res gestae, even though, in fact, apparently accurate about the eventual result of his invitation to a nighttime visit to the home of his about-to-be-divorced and soon-to-be-widowed wife.

The Pennsylvania court recognized in *Com. v. Lark*, 518 Pa. 290, 543 A.2d 491 (1988), as defined in *Scadden v. State*, 732 P.2d 1036 (Wyo.1987), that res gestae sometimes accorded the complete story rationale by proving its immediate context of happening near the place and time. *See State v. Williams*, 454 So.2d 1211, 1214 (La.App.1984) (quoting *State v. Haarala*, 398 So.2d 1093, 1097 (La.1981)), " 'close connexity in time and location * * *.' " The Oklahoma court likewise in *Sevier v. State*, 355 P.2d 1018, 1023 (Okl.Cr.1960), recognized: "Though the term 'res gestae' is almost indefinable there are certain prerequisites necessary in identifying testimony as part of the res gestae." The relationship between the felony and the homicide which it precipitated was similarly recognized in definition and discussion in *Smith v. State*, 447 So.2d 1327 (1983), *aff'd*, 447 So.2d 1334 (Ala.1984). In *State v. Sherry*, 233 Kan. 920, 667 P.2d 367 (1983), the principal occurrence was an intended drug sale about which the participant's comments constituted the res gestae.

The recognition of the temporal relationship is demonstrated in the 1923 Illinois case of *People v. Jarvis*, 306 Ill. 611, 138 N.E. 102 (1923), where later events which may have constituted further criminal conduct which had no causal connection with the initial shooting of the deceased were not admissible as part of the res gestae. The entire inquiry is directed to the causal relationship between the subordinate event and the offense to which the connexity is attached. The test not being the closeness of time of such declarations or acts to the act charged, but their causal relation therewith. *Id.* 138 N.E. at 103.

The connexity or res gestae or applicability test for felony murder to relate the

underlying felony to the resulting homicide is frequently stated in terms of "time, distance, and the causal relationship * * *." *State v. Hearron*, 228 Kan. 693, 619 P.2d 1157, 1160 (1980).

Time, distance, and the causal relationship between the underlying felony and the killing are factors to be considered in determining whether the killing is a part of the felony and, therefore, subject to the felony-murder rule. Whether the underlying felony had been abandoned or completed prior to the killing so as to remove it from the ambit of the felony-murder rule is ordinarily a question of fact for the jury to decide.

*Id.* See also *Rider*, 625 P.2d 425. It is stated as time, place and causal connection, *State v. Corneau*, 109 N.M. 81, 781 P.2d 1159 (1989), in addressing the res gestae of the felony and further stated as felony continued in progress in regard to escape time, *State v. Wayne*, 169 W.Va. 785, 289 S.E.2d 480 (1982). See also *State v. Lee*, 13 Wash.App. 900, 538 P.2d 538, 542 (1975), where the causal connection was considered:

This causal connection has been referred to as within the res gestae of the intended crime. In commenting on the historical background of the felony-murder doctrine, the court in *State v. Suit*, 129 N.J.Super. 336, 323 A.2d 541, 546 (1974), noted:

"The doctrine arose and is premised upon a theory of transferred intent, that is, that one perpetrating or attempting to perpetrate an inherently dangerous felony possesses a malevolent state of mind which the law calls malice. . . .

"It is this intent which transfers into that element of malice necessary to sustain a charge of first-degree murder and is imputed to the person who kills during the felony. Thus, when killing occurs in the commission of a robbery, it is murder in the first degree, even though death was not intended."

The Montana court in *State v. Weinberger*, 206 Mont. 110, 671 P.2d 567, 569 (1983) recognized a quote from 2 Charles E. Torcia, Wharton's Criminal Law § 149, at 221 (14th ed. 1978):

"It is not the purpose of the felony-murder rule to foist authorship of a homicide upon a felon; the purpose is merely to clothe the felon's act of killing with malice."

The Montana court then quoted from *Commonwealth v. Redline*, 391 Pa. 486, 137 A.2d 472, 476 (1958):

"In adjudging a felony-murder, it is to be remembered at all times that the thing which is imputed to a felon for a killing incidental to his felony is *malice* and *not the act of killing*. The mere coincidence of homicide and felony is not enough to satisfy the requirements of the felony-murder doctrine. 'It is necessary . . . to show that the conduct causing death was done in furtherance of the design to commit the felony. Death must be a consequence of the felony . . . and not merely coincidence.' (Citing authority.)" (Emphasis in original.)

*Weinberger*, 671 P.2d at 569. In application of the rule, the Montana court found inadequacy of proof, plan or design and insufficiency of the evidence to establish the underlying felony to be chargeable to the incident of homicide. The application of the *Weinberger* causal relation rule clearly applies to the theory of defense of Bouwkamp that his participation occurred only as an accessory after the fact. If that was true, he could not have been guilty of felony murder.

The felony as the principal occurrence was recognized again by the Kansas court in *State v. Peterson*, 236 Kan. 821, 696 P.2d 387, 394 (1985):

Res gestae is a broader concept than an exception to the hearsay rule. It actually deals with admissibility of evidence of acts or declarations before, during or after happenings of the principal event. Those acts done or declarations made before, during or after the happening of the principal occurrence may be admitted as part of the res gestae where those acts or declarations are so closely connected with the principal occurrence

as to form in reality a part of the occurrence.

A foundational case frequently referenced is *State v. Diebold*, 152 Wash. 68, 277 P. 394, 395–96 (1929) where it was stated:

> As to when a homicide may be said to have been committed in the course of the perpetration of another crime, the rule is laid down in 13 R.C.L. 845, as follows: "It may be stated generally that a homicide is committed in the perpetration of another crime, when the accused, intending to commit some crime other than the homicide, is engaged in the performance of any one of the acts which such intent requires for its full execution, and, while so engaged, and within the res gestae of the intended crime, and in consequence thereof, the killing results. It must appear that there was such actual legal relation between the killing and the crime committed or attempted, that the killing can be said to have occurred as a part of the perpetration of the crime, or in furtherance of an attempt or purpose to commit it. In the usual terse legal phraseology, death must have been the probable consequence of the unlawful act \* \* \*."

In *Diebold*, appellant was a taxi driver who illegally borrowed a vehicle and thereafter, upon becoming extremely intoxicated, ran the vehicle into the decedent. Felony murder was asserted based on the original unlawful taking of the vehicle, even though the defendant was in the process of vehicle return when the death resulted. The Washington court determined that felony murder could not be applied from the initial vehicle taking where nothing in the nature of pursuit or flight was involved. *See, however, State v. Leech*, 54 Wash.App. 597, 775 P.2d 463 (1989), where a firefighter died in fighting the defendant's arson-started fire.

Likewise in *King v. Com.*, 6 Va.App. 351, 368 S.E.2d 704 (1988), following the earlier case of *Wooden v. Com.*, 222 Va. 758, 284 S.E.2d 811 (1981), the death of the co-felon in an airplane crash while the duo were involved in transporting marijuana could not create a felony murder basis for conviction. *Davis v. Com.*, 12 Va.App. 408, 404 S.E.2d 377 (1991) was directly contrary in factual status where the defendant was trying to escape from motor vehicular pursuit since he was a habitual offender. The illegal driving in attempt to escape and resulting death of an innocent person added up to felony murder. Likewise, the act of driving when forbidden to do so in order to avoid detection accrued felony murder liability where the police automobile chase followed burglary of a car in *State in Interest of J.R.*, 234 N.J.Super. 388, 560 A.2d 1279 (1988).

Asportation and continuing transaction can be utilized to find the res gestae for application to a robbery homicide felony murder. The gravamen of the offense is the intent to commit the underlying felony, not the intent to commit the killing. *State v. Lassen*, 679 S.W.2d 363 (Mo.App.1984). The principle addressed in the case, although not factually found, is that larceny from the body of one killed as an afterthought does not constitute a capital felony. Although the killing may precede, coincide or follow the robbery and still be committed in the perpetration, initial felonious intent is required. Differentiating from some proximate cause authorities, the rule is also stated: " 'A killing is committed ... within the purview of a felony-murder statute "when there is no break in the chain of events leading from the initial felony to the act causing death, so that the homicide is linked to or part of the series of incidents forming one continual transaction." ' " *State v. Covington*, 290 N.C. 313, 226 S.E.2d 629, 639–40 (1976) (quoting *State v. Thompson*, 280 N.C. 202, 185 S.E.2d 666, 673 (1972)).

The issue is factual if the intent to commit the felony as the initiating event of the transaction is denied. *Wooten*, 245 S.E.2d 699. Obviously, if the facts impeach the denial testimony, presentation of the jury issue and approval of the resulting jury verdict appropriately results. The court in *Wooten* recognized that proof of intent to steal at the time of the homicide was required for conviction of first degree mur-

der under the felony murder doctrine. *Id.* at 706. When the homicide is within the res gestae of the initial crime and is an emanation thereof, it is committed in the perpetration of that crime in the statutory sense. *State v. Milentz,* 547 S.W.2d 164 (Mo.App.1977); *State v. Adams,* 339 Mo. 926, 98 S.W.2d 632 (1936). It was similarly stated in California: "It is sufficient that the homicide be related to the felony *and have resulted as a natural and probable consequence thereof * * *."* *People v. Taylor,* 112 Cal.App.3d 348, 358, 169 Cal. Rptr. 290, 295 (1980) (emphasis added). *See also People v. Chavez,* 37 Cal.2d 656, 234 P.2d 632 (1951).

The appropriate resolution of the relationship required is fact sensitive under the circumstances presented which means the sequence of events is significant but may not be controlling on a temporal basis alone. The proper examination is whether a homicide occurred as a result of commission of a felony in order that the transferred intent from the commission of the felony creates the mens rea required where otherwise premeditation should exist to define a first degree murder offense. The juxtaposition and the lack of specificity in the language used for majority decision is just plain wrong. The dogma in *Cloman* which graduated to the supposed rule in *Price* is factually inapplicable and inappropriate for further application to this case. The singular logical fallacy resulted from this court's determination by applied characterizations rather than use of facts to reason to a logical conclusion. In philosophy, at least, a *Sandstrom* presumption was created.

It is apparent that a temporal relationship is not meaningless, that the homicide is required to be a result of the intended commission of the felony and an accessory after the fact does not create the felony murder responsibility for an earlier homicide that may have occurred without the participation or assistance of the defendant. The majority's conception to the con-

trary is clearly and almost uniformly contrary to the established state of the law. The unimportant relationship instruction which was given under these circumstances should constitute reversible error. It presumptively and significantly misled the jury about the relationship between the charged crime and controverted conduct. That instruction is best consigned to the "never again to be used" file and a logically valid alternative should be given in replacement. In a *Cloman* circumstance, the instruction usage is harmless nonsense; where it matters in a case like this, it becomes a factual inaccuracy conceptualized into a legal presumption.

## VI.

## SINGLE OR SEPARATE VERDICTS FOR ENTRY OF THE JURY DETERMINATION OF GUILT FOR THE DIFFERENTIATED CHARACTER OF FIRST DEGREE MURDER, PREMEDITATED KILLING OR FELONY MURDER

For this appeal, the patchwork verdict and not the special unanimous decision instruction is presented. However, the issues are essentially the same.[10] This is the most complex and difficult aspect of the trilogy issues in this case. We are here presented the unitary verdict unanimous instruction decidendi which has created unlimited litigative review with frequently differentiated results and inconclusive justifications used to affirm possible non-unanimous jury decisions. *See Schad,* 111 S.Ct. 2491, compared with *People v. Lowe,* 660 P.2d 1261 (Colo.1983) and *State v. Alford,* 329 N.C. 755, 407 S.E.2d 519 (1991), followed by *People v. O'Neill,* 803 P.2d 164 (Colo.1990); *People v. Freeman,* 668 P.2d 1371 (Colo.1983); *State v. Boots,* 308 Or. 371, 780 P.2d 725 (1989); and, in particular, *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975) and *In re Win-*

**10.** Hayden J. Trubitt, *Patchwork Verdicts, Different-Jurors Verdicts, and American Jury Theory: Whether Verdicts Are Invalidated by Juror Disagreement on Issues,* 36 Okla.L.Rev. 473 (1983); Barbara L. Lauer, Comment, *Jury Agreement and the General Verdict in Criminal Cases,* XIX Land & Water L.Rev. 207 (1984).

*ship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).[11]

The issue is not new in recent date to Wyoming since first presented in dictum in *Cloman*, 574 P.2d 410 and more recently applied in *Price*, 807 P.2d 909. In *Cloman*, the defendant and co-participant brutally murdered three good samaritan benefactors, robbed the bodies and took the vehicle to Chicago where the malefactors were apprehended. Neither premeditated homicide nor felony murder involvement was realistically in question. In what originally was a death penalty case, that result was only altered by the unconstitutionality of the Wyoming statute. *Kennedy v. State*, 559 P.2d 1014 (Wyo.1977); *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

The sum and substance of the *Cloman* opinion was the evidentiary finding for the jury decision that the multiple homicides occurred in the perpetration of robbery and were premeditated and willful malice killings. A disjunctive unitary verdict had been used and this court applied the fact-finding substitutional evidence rule to affirm. Unfortunately, the opinion hypothesized an unknown about what the jury could have found, not what the evidence would have sustained. The substantiated evidence rule to be hereafter discussed in detail for the court justified a possible non-unanimous jury decision and a composite verdict result. *Cloman* was not remarkable in evidentiary clarity of murder theory where including both felony murder and premeditated murder. Overtly, problems would have been avoided for adjudication in *Cloman* if a standard had been established for usage of the bilateral verdict for premeditated and felony murder so the appellate court does not become required to act as the conceptional fact finder. *Cloman* also created the alternative problem of temporal relationship irrelevancy, again as unnecessary dictum. The *Cloman* uni-

tary verdict dialectic use was then followed in *Price* where the real conflict presented was participation of the defendant in a felony to justify the felony murder component of the first degree murder conviction. *Price*, 807 P.2d 909, Urbigkit, C.J., dissenting.

The historical Wyoming standard for unanimity started in early case law and was expressly stated by quotation from an even earlier Missouri case:

> "The defendant was entitled to a unanimous verdict of the jury upon the issues of his guilt or innocence of the particular offense for which he was on trial. Under this instruction and the general verdict returned, some of the jurors may have believed the testimony in support of the charge as to one of the gaming devices and disbelieved the testimony as to the other, while the remaining members of the jury may have found and believed conversely."

*State v. Tobin*, 31 Wyo. 355, 371, 226 P. 681, 686 (1924) (quoting *State v. Washington*, 242 Mo. 401, 409, 146 S.W. 1164, 1166 (1912)). It might be conceded now that justice has been permanently truncated by non-unanimous verdict adaptation in constitutional law in Wyoming, except the United States Supreme Court has been called to more recently examine the subject in *Schad*, 111 S.Ct. 2491, where that court decided, on a four plurality, one concurrence and a four dissent vote, whether the identical unitary verdict issue produced a constitutional misappropriation in process. Conversely, the national legal trend in all state courts is clearly in the opposite direction where now aimed to recapture unanimity as a function of jury decisions and undoubtedly to avoid unnecessary appeals and divisive doubt as to what the jury really determined.

*Schad* came to the United States Supreme Court from the death penalty affirmation of the Arizona Supreme Court in

11. The even more recent United States Supreme Court case of *Griffin v. United States*, — U.S. ——, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991) avoids unanimity issues under the Sixth Amendment and considers only due process questions under the Fifth Amendment in review of a general verdict on "multi-object conspiracy" conviction. Consequently, the *Schad* issue is not reviewed.

*State v. Schad,* 163 Ariz. 411, 788 P.2d 1162 (1989), *cert. granted,* —— U.S. ——, 111 S.Ct. 243, 112 L.Ed.2d 202 (1990). *See also State v. Schad,* 129 Ariz. 557, 633 P.2d 366 (1981), *cert. denied,* 455 U.S. 983, 102 S.Ct. 1492, 71 L.Ed.2d 693 (1982) and *State v. Schad,* 142 Ariz. 619, 691 P.2d 710 (1984). *Schad* addressed a hitchhiker killing of his automobile ride host. In *Schad,* the Arizona court gave quick consideration to the unitary verdict issue in comment, including citations, of the Arizona cases of *State v. Encinas,* 132 Ariz. 493, 647 P.2d 624 (1982) and *State v. Axley,* 132 Ariz. 383, 646 P.2d 268 (1982), and then quoted from *Encinas:*

> In *State v. Encinas,* 132 Ariz. 493, 647 P.2d 624 (1982), we stated:
>
> "In Arizona, first degree murder is only one crime regardless whether it occurs as a premeditated murder or a felony murder. *See State v. Axley,* 132 Ariz. 383, 646 P.2d 268 (1982). Although a defendant is entitled to a unanimous jury verdict on whether the criminal act charged has been committed, *State v. Counterman,* 8 Ariz.App. 526, 448 P.2d 96 (1968), the defendant is not entitled to a unanimous verdict on the precise manner in which the act was committed."
>
> *Id.* at 496, 647 P.2d at 627.
>
> Our decision in *State v. Smith,* 160 Ariz. 507, 774 P.2d 811 (1989), did not change the substantive rule that it was not error to have one form of verdict for first degree murder even though both premeditation and felony murder were being submitted to the jury. *Smith* does, however, strongly urge that alternate forms of verdict be submitted to a jury when a case is submitted on alternative theories of premeditated and felony murder. *Id.* at 507, 774 P.2d at 811.

*Schad,* 788 P.2d at 1168.

It is difficult to relate the litigative history of the unitary verdict for differentiated offense first degree murder in Arizona to the treatment by the United States Su-preme Court plurality decision following further appeal. In first component, the special concurrence of Justice Scalia is simplistic and exact. Unfortunately, it tends to put in issue an entire universe of differentiated offense unitary verdict cases which are not felony murder/premeditated murder/first degree murder in nature. See, for example, the basic case on the subject, *United States v. Gipson,* 553 F.2d 453 (5th Cir.1977), which also was conceptualized by the plurality in statement:

> We are not persuaded that the *Gipson* approach really answers the question, however. Although the classification of alternatives into "distinct conceptual groupings" is a way to express a judgment about the limits of permissible alternatives, the notion is too indeterminate to provide concrete guidance to courts faced with verdict specificity questions.

*Schad,* 111 S.Ct. at 2498.[12]

The special concurrence of Justice Scalia defined a historical justification for the unitary verdict for the differentiated offenses of these specific crimes, felony murder and premeditated murder. He finds only the single offense in first degree murder which may alternatively be committed by the entirely different activities of felony murder or premeditated killing. To differentiate the permissible treatment of first degree murder as a single offense, whether or not reached by entirely different offense activities from "umbrella" offenses, he examined historical justification to extract provided due process. Justice Scalia does not address requirements for unanimity, except in rejection of the requirement, he says:

> As the plurality observes, it has long been the general rule that when a single crime can be committed in various ways, jurors need not agree upon the mode of commission. * * * That rule is not only constitutional, it is probably indispensable in a system that requires a unanimous jury verdict to convict.

**12.** *See* Comment, *Right to Jury Unanimity on Material Fact Issues: United States v. Gipson,* 91 Harv.L.Rev. 499 (1977).

*Id.* at 2506. This becomes the epitome of pragmatic constitutionalism. For *Schad* and to define federal constitutional bases as the decisive route for history to create due process, Justice Scalia said:

It is precisely the historical practices that *define* what is "due." "Fundamental fairness" analysis may appropriately be applied to *departures* from traditional American conceptions of due process; but when judges test their individual notions of "fairness" against an American tradition that is deep and broad and continuing, it is not the tradition that is on trial, but the judges.

And that is the case here. Submitting killing in the course of a robbery and premeditated killing to the jury under a single charge is not some novel composite that can be subjected to the indignity of "fundamental fairness" review. It was the norm when this country was founded, was the norm when the Fourteenth Amendment was adopted in 1868, and remains the norm today. Unless we are here to invent a Constitution rather than enforce one, it is impossible that a practice as old as the common law and still in existence in the vast majority of States does not provide that process which is "due."

If I did not believe that, I might well be with the dissenters in this case.

*Id.* at 2507 (emphasis in original).

His further discussion is informative:

Certainly the plurality provides no satisfactory explanation of why (apart from the endorsement of history) it is permissible to combine in one count killing in the course of robbery and killing by premeditation. The only point it makes is that the depravity of mind required for the two may be considered morally equivalent. * * * But the petitioner here does not complain about lack of moral equivalence: he complains that, as far as we know, only six jurors *believed* he was

participating in a robbery, and only six *believed* he intended to kill. Perhaps moral equivalence is a *necessary* condition for allowing such a verdict to stand, but surely the plurality does not pretend that it is *sufficient*. (We would not permit, for example, an indictment charging that the defendant assaulted either X on Tuesday or Y on Wednesday, despite the "moral equivalence" of those two acts.) Thus, the plurality approves the Arizona practice in the present case because it meets *one* of the conditions for constitutional validity. It does not say what the *other* conditions are, or why the Arizona practice meets them. With respect, I do not think this delivers the "critical examination," * * * which the plurality promises as a substitute for reliance upon historical practice. In fact, I think its analysis ultimately relies upon nothing but historical practice (whence does it derive even the "moral equivalence" requirement?)—but to acknowledge that reality would be to acknowledge a rational limitation upon our power, which bobtailed "critical examination" obviously is not. "Th[e] requirement of [due process] is met if the trial is had according to the settled course of judicial proceedings. Due process of law is process due according to the law of the land."[13]

*Id.* at 2507 (emphasis in original and quoting *Walker v. Sauvinet,* 2 Otto 90, 92 U.S. 90, 93, 23 L.Ed. 678 (1875)).

Any analysis of *Schad* fails to make much sense unless first attention to the Justice Scalia position understands his recognition of the obvious. We deal with two totally different societal offenses necessarily having in common only a resulting homicide. Due process is the concern which he finds to be served in the unitary verdict—non-unanimous status by historical justification of continued use. Strangely enough for Wyoming, that historical perspective is a total void in adjudicated case law from

---

**13.** Categorical reliance on some general historical perspective provides intrinsic dangers when analysis of intendment and application of a constitution is considered. Less than twenty legal executions have occurred in the history of the territory and the state of Wyoming. Converse-

ly, the community adaptation of applied instant justice by lynching reached a significantly greater number of "final decisions." Since it did occur then, it will not necessarily constitutionally justify lynching now as an answer to society's disturbance about individuals' misconduct.

date of statehood until 1978 when *Cloman* was authored by this court.

To address then the plurality decision in *Schad*, it is found that after first disregarding *Gipson* and its whole universe of federal and state determinations, the author states:

> We do not, of course, suggest that jury instructions requiring increased verdict specificity are not desirable, and in fact the Supreme Court of Arizona has itself recognized that separate verdict forms are useful in cases submitted to a jury on alternative theories of premeditated and felony murder. *State v. Smith*, 160 Ariz. 507, 513, 774 P.2d 811, 817 (1989). We hold only that the Constitution did not command such a practice on the facts of this case.

*Schad*, 111 S.Ct. at 2504.

Having said what is right but not required, the plurality directs itself to the conceptualization similar to the inquiry about the number of angels dancing on the head of a pin by addressing moral equivalency:

> Whether or not everyone would agree that the mental state that precipitates death in the course of robbery is the moral equivalent of premeditation, it is clear that such equivalence could reasonably be found, which is enough to rule out the argument that this moral disparity bars treating them as alternative means to satisfy the mental element of a single offense.

*Id.* at 2503–04.

The problem with the concept of moral equivalency is that it ignores the requirement for the jury to unanimously find guilt within conduct constituting a criminal offense and leaves an ad hoc rule to be immediately applied. Obviously, courts and prosecutors have declined to adopt the "useful approach" involved in a jury unanimity finding provided by separate verdict forms for these two factually differentiated characters of criminal conduct. In the individual case, death may be the result of both (*Cloman*), or one (*Price*), or even on occasion neither, where the killing was done by someone else and a precipitative felony was not committed by the defendant. Conceptually, for the theory of defense for this defendant, the latter is what Bouwkamp argues and testified actually occurred.

In his *Schad* opinion writing, Justice White, with the four Justice dissent, appropriately recognized that the decision of neither the plurality nor the special concurrence accommodated the due process mandates of *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, which provided a fundamental tenant for this nation's criminal law. In declining to hide the actuality in either historical practice or moral equivalency, Justice White stated:

> It is true that we generally give great deference to the States in defining the elements of crimes. I fail to see, however, how that truism advances the plurality's case. There is no failure to defer in recognizing the obvious: that premeditated murder and felony murder are alternative courses of conduct by which the crime of first-degree murder may be established.

*Schad*, 111 S.Ct. at 2508.

He appropriately recognized that the Arizona statute thus sets forth three general categories of conduct which constitute first degree murder (premeditated, during escape and felony murder). The Wyoming statute here at issue, Wyo.Stat. § 6–2–101, has only two components—premeditated murder and felony murder.

Within that concept, Justice White then established:

> Here, the prosecution set out to convict petitioner of first-degree murder by either of two different paths, premeditated murder and felony murder/robbery. Yet while these two paths both lead to a conviction for first-degree murder, they do so by divergent routes possessing no elements in common except the fact of a murder. * * *
>
> *       *       *       *       *       *
>
> Unlike premeditated murder, felony murder does not require that the defendant commit the killing or even intend to kill, so long as the defendant is involved

in the underlying felony. On the other hand, felony murder—but not premeditated murder—requires proof that the defendant had the requisite intent to commit and did commit the underlying felony. *State v. McLoughlin*, 139 Ariz. 481, 485, 679 P.2d 504, 508 (1984). Premeditated murder, however, demands an intent to kill as well as premeditation, neither of which is required to prove felony murder. Thus, contrary to the plurality's assertion, * * * the difference between the two paths is not merely one of a substitution of one *mens rea* for another. Rather, each contains separate elements of conduct and state of mind which cannot be mixed and matched at will. It is particularly fanciful to equate an intent to do no more than rob with a premeditated intent to murder.

Consequently, a verdict that simply pronounces a defendant "guilty of first-degree murder" provides no clues as to whether the jury agrees that the three elements of premeditated murder or the two elements of felony murder have been proven beyond a reasonable doubt. Instead, it is entirely possible that half of the jury believed the defendant was guilty of premeditated murder and not guilty of felony murder/robbery, while half believed exactly the reverse. To put the matter another way, the plurality affirms this conviction without knowing that even a single element of either of the ways for proving first-degree murder, except the fact of a killing, has been found by a majority of the jury, let alone found unanimously by the jury as required by Arizona law. A defendant charged with first-degree murder is at least entitled to a verdict—something petitioner did not get in this case as long as the possibility exists that no more than six jurors voted for any one element of first-degree murder, except the fact of a killing.

*Id.* at 2508–09 (footnote omitted).

Similarly well recognized by Justice White's dissent is that the problem with the statute

under a single heading, criminalizes several alternative patterns of conduct. While a State is free to construct a statute in this way, it violates due process for a State to invoke more than one statutory alternative, each with different specified elements, without requiring that the jury indicate on which of the alternatives it has based the defendant's guilt.

* * * Allowing the jury to return a generic verdict following a prosecution on two separate theories with specified elements has the same effect as a jury verdict of "guilty of crime" based on alternative theories of embezzlement or reckless driving.

*Id.* at 2509–10.[14]

I totally fail to find rational justification in the *Schad* plurality or special concur-

---

**14.** A contemporaneous anomaly can be extracted in comparing the majority, concurrence and dissent from *Schad* with *McKoy v. North Carolina*, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990), where Justice Scalia in dissent argues for jury unanimity on each mitigating circumstance in a death penalty case and Justice Blackmun, in text and footnote in his concurring opinion, stated for analogy:

> The dissent suggests that the rule announced in *Mills* [*v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988) ] is an aberration, a quirk of our Eighth Amendment jurisprudence. In fact, however, it is the North Carolina unanimity requirement which represents an extraordinary departure from the way in which juries customarily operate. Juries are typically called upon to render unanimous verdicts on the ultimate issues of a given case. But it is understood that different jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line. Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict.[5]

> 5. There is one significant exception to this principle, but it does not support the dissent's position. In federal criminal prosecutions, where a unanimous verdict is required, the Courts of Appeals are in general agreement that "[u]nanimity ... means more than a conclusory agreement that the defendant has violated the statute in question; there is a requirement of substantial agreement as to the principal factual elements underlying a specified offense." *United States v. Ferris*, 719 F.2d 1405, 1407 (CA9 1983).

*Id.* 110 S.Ct. at 1236–37 (footnote omitted). Citing five other cases, Justice Blackmun continued in the footnote stating:

> This rule does not require that each bit of evidence be unanimously credited or entirely discarded, but it does require unanimous

rence to deny a unanimous jury verdict requirement under the Wyoming Constitution, statutes, rules of criminal procedure or even historical case law. *Tobin*, 226 P. 681; *First Nat. Bank of Rock Springs, Wyo. v. Foster*, 9 Wyo. 157, 61 P. 466 (1901). It seems certain in bland and decisive logic that however we can evaluate historical precedent for the law to now reach moral equivalency instead of historical experience is just not the real fact. American law has long recognized the danger of a potentially non-unanimous jury verdict or verdict on an alternatively improper basis. *Stromberg v. People of State of California*, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931). The philosophical underpinnings of American law were provided by Justice Reed in *Andres v. United States*, 333 U.S. 740, 748, 68 S.Ct. 880, 884, 92 L.Ed. 1055 (1948), where he clearly and succinctly stated: "Unanimity in jury verdicts is required where the Sixth and Seventh Amendments apply." *Cf. Apodaca v. Oregon*, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972), non-unanimity in non-first degree murder criminal cases. The footnote provided in the Justice Reed composition of *Andres*, 333 U.S. at 748 n. 13, 68 S.Ct. at 884 n. 13 contributed an even earlier thoughtful recognition of *American Pub. Co. v. Fisher*, 166 U.S. 464, 468, 17 S.Ct. 618, 619, 41 L.Ed. 1079 (1897): "Now unanimity was one of the peculiar and essential features of trial by jury at the common law. No authorities are needed to sustain this proposition."

Fortunately, to address the kind of dilemma that has been created by *Schad*, there is available for review another recent case which justifies special evaluation. In the homicide prosecution in *Boots*, 780 P.2d 725, *accord State v. Murray*, 308 Or. 496, 782 P.2d 157 (1989), the trial court instructed the jury in a fashion which accords with the plurality review of the unitary verdict issue in *Schad*:

"With regard to this charge, it is not necessary for all jurors to agree on the manner in which Aggravated Murder was committed. That is, some jurors may find that it was committed during the course of and in furtherance of Robbery in the First Degree, and others may find it was committed to conceal a crime or its perpetrator. Any combination of twelve jurors agreeing that one or the other or both occurs is sufficient to establish this offense."

*Boots*, 780 P.2d at 727.

An interesting comparison is provided by the Oregon court in the decision which directly relates to the effect of what occurred to Bouwkamp in this case. In *Boots*, the trial court instruction was based on the precedent of the earlier Oregon case of *State v. Hazelett*, 8 Or.App. 44, 492 P.2d 501 (1972), which is frequently found within the string citations used in other jurisdictions to justify unitary verdict system for

---

agreement as to the nature of the defendant's violation, not simply the fact that a violation has occurred.

*Id.* at 1237 n. 5.

Furthermore, in considering the moral equivalency and characterized historical tradition standard provided in *Schad*, it would be well to look back at what Justice Black said in dissent in *Turner v. United States*, 396 U.S. 398, 426, 90 S.Ct. 642, 657, 24 L.Ed.2d 610 (1970) in response to an opinion which Justice White had authored:

The Framers of our Constitution and Bill of Rights were too wise, too pragmatic, and too familiar with tyranny to attempt to safeguard personal liberty with broad, flexible words and phrases like "fair trial," "fundamental decency," and "reasonableness." Such stretchy, rubberlike terms would have left judges constitutionally free to try people charged with crime under will-o'-the-wisp standards impro-

vised by different judges for different defendants. Neither the Due Process Clause nor any other constitutional language vests any judge with such power. Our Constitution was not written in the sands to be washed away by each wave of new judges blown in by each successive political wind that brings new political administrations into temporary power. Rather, our Constitution was fashioned to perpetuate liberty and justice by marking clear, explicit, and lasting constitutional boundaries for trials. One need look no further than the language of that sacred document itself to be assured that defendants charged with crime are to be accorded due process of law—that is, they are to be tried as the Constitution and the laws passed pursuant to it prescribe and not under arbitrary procedures that a particular majority of sitting judges may see fit to label as "fair" or "decent[ ]" [or assure a moral equivalency].

the first degree murder conviction where premeditation and felony murder are not separately charged or determined in verdict.[15]

The Oregon court said:

The challenged instruction explicitly tells jurors to return a verdict of aggravated murder even if some of them doubt that the defendant was a participant in the robbery but believe that he meant to conceal it and others believe that defendant was a robber but not that concealing the crime played a role in the killing.

The implications go further. In another case, there could be several charges under different subsections of ORS 163.095 in addition to a robbery and an intent to conceal, for instance, that the defendant was paid to commit the murder, that the victim was a police officer, and that the death resulted from defendant's intent to maim the victim. The instruction would tell jurors to return a verdict of aggravated murder, although some do not believe that the officer was present in an official capacity and others do not believe that defendant was paid, or intended to maim, or that there was a robbery or an intent to conceal it. In short, the instruction relieves the jury from seriously confronting the question whether they agree that any factual requirement of aggravated murder has been proved beyond a reasonable doubt, so long as each juror is willing to pick one theory or another.

*Boots*, 780 P.2d at 727–28.

In recognizing and differentiating a Wisconsin case, *Holland v. State*, 91 Wis.2d 134, 280 N.W.2d 288 (1979), *cert. denied*, 445 U.S. 931, 100 S.Ct. 1320, 63 L.Ed.2d 764 (1980), the Oregon court also quoted and then considered the substance of the *Gipson* rule:

The *Gipson* opinion comes closer to the present case than do cases like *Holland* under statutes defining who besides the primary actor is a principal. Nothing in ORS 163.095 or in ORS 136.450 requires or supports an instruction that, as *Gipson* notes, creates serious constitutional doubts.

What led the *Hazelett* court astray was the simple error of counting and adding those jurors who are convinced of any one distinct statutory element rather than focusing, for each element, on the jurors who may not be convinced of that element, though they separately might convict on their own, equally nonunanimous, view of the decisive facts. Under the proper focus—the possible dissent of some jurors from any one factual finding—the principle of decision is evident. The instruction that the jury need not unanimously agree either on the charge under [premeditated murder] or on the charge under [homicide to conceal identity] was error.

*Boots*, 780 P.2d at 731.

To adequately address Wyoming law regarding W.R.Cr.P. 31 (formerly W.R.Cr.P. 32), which provides the requirement of unanimity, and attendant Wyoming constitutional rights under Wyo. Const. art. 1, § 9 and for present recognition of the national constitution as defined in *Schad*, there is a requirement related to the two separate but clearly intertwined character of cases. Many came forward on appeal by denied special instruction and others, like this case, rest upon the unitary verdict form used.

The lead case in citation usage for instruction was *Gipson*, 553 F.2d 453 (see, however, the recent case of *United States v. Holley*, 942 F.2d 916 (5th Cir.1991)) and

---

**15.** The Oregon Supreme Court made an interesting comment in *Boots*, 780 P.2d at 729 in the analysis of applicable cases:

Some are decisions of intermediate courts which, of course, may control the practice in those states but may prove to be erroneous when the state's highest court addresses the issue.[7]

[7.] *E.g., State v. Anderson*, 16 Conn.App. 346, 547 A.2d 1368, *app. den.* 209 Conn. 828, 552

A.2d 433 (1988); *People v. Travis*, 170 Ill.App.3d 873, 121 Ill.Dec. 830, 525 N.E.2d 1137 (1988), *cert. den.* [489] U.S. [1024], 109 S.Ct. 1149, 103 L.Ed.2d 209 (1989); *People v. Ewing*, 102 Mich. App. 81, 300 N.W.2d 742 (1980), *lv. den.* (1982); *State v. Begbie*, 415 N.W.2d 103 (Minn.Ct.App. 1987), *rev. den.* (1988); *State v. Brigham*, 709 S.W.2d 917 (Mo.Ct.App.1986).

the informational resource on verdicts was initiated by *People v. Sullivan*, 173 N.Y. 122, 65 N.E. 989 (1903). There are a significant number of self-standing rules or characterizations that have been enunciated in the cases to justify non-requirement of a unanimous decision by the jury. However, within the totality of the cases, the current *Schad* plurality resting on the concept of moral equivalency is indeed novel.[16] The predetermined justification in historical analysis utilized by Justice Scalia, although found with relevancy to the adaptation in *Sullivan*, as presently phrased in due process rather than *In re Winship* unanimity, is also now completely new in explaining how different acts separately charged do not either justify the unitary instruction or require the differentiated verdict. Concepts asserted for justification in argumentative phraseology or preclusive determination are:

1. Lack of dual verdict is justified to affirm the conviction if the jury reasonably could have convicted on both alternatives. *Price*, 807 P.2d 909; *Cloman*, 574 P.2d 410. *This is the appellate court fact-finding substitution for a jury unanimity requirement on what occurred to create the crime.*

2. Premeditation and felony murder are alternative ways to establish the mental state required for a first degree murder conviction. *State v. Wilson*, 220 Kan. 341, 552 P.2d 931 (1976). How the crime may have occurred need not necessarily be unanimously determined by the jury for assessment of a mental state and the application of the murder conviction responsibility. The jury can assess alternative responsibilities without unanimous determination of any one concept, *e.g.*, malice—either premeditative or alternatively presumed intent by felony participation.

3. Premeditation or felony murder can be an aggravating circumstance to create the capital crime of first degree murder. Thus, the jury does not separately and unanimously need to determine what alter-

natives exist. *State v. Tillman*, 750 P.2d 546 (Utah 1987).

4. The appellate court assumes that the jury must have been unanimous because the facts were subsumed in the alternative theories as well. *State v. Jones*, 193 Conn. 70, 475 A.2d 1087 (1984); *Tyler v. United States*, 495 A.2d 1180 (D.C.App.1985).

5. A general unanimity instruction suffices to instruct the jury that they must be unanimous on whatever specifically forms the proper basis for the jury verdict, except where there is a genuine possibility of jury confusion and that conviction may result from different jurors concluding that the defendant committed different acts. *United States v. Payseno*, 782 F.2d 832 (9th Cir.1986); *United States v. Echeverry*, 719 F.2d 974 (9th Cir.1983). *See also Jeffries v. Blodgett*, 771 F.Supp. 1520 (W.D.Wash. 1991).

6. Alternative factual details have no separate legal importance. *Gray v. United States*, 544 A.2d 1255 (D.C.App.1988); *State v. Souhrada*, 122 Mont. 377, 204 P.2d 792 (1949); *State v. Flathers*, 57 S.D. 320, 232 N.W. 51 (1930); *State v. Giwosky*, 109 Wis.2d 446, 326 N.W.2d 232 (1982).

The initial concept for the premeditated felony murder first degree unitary verdict came from *Sullivan*, 65 N.E. 989. In that 1903 case, the New York court authored the dual claim, single verdict, sufficiency of the evidence on each claim rule. If, as to either claim, the evidence was insufficient to justify the submission of the question to the jury, the conviction must be reversed since it cannot be known on which ground the jury based its verdict. See, however, although not phrased on Sixth Amendment terms, the non-unanimity discussion in *Griffin v. United States*, — U.S. —, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991). The list may have become differentiated between conjunctive and disjunctive charging; the result, however, is any one or not all.

However, the court then said in *Sullivan*, 65 N.E. at 989 (quoting *Murray v. New York Life Insurance Co.*, 96 N.Y.

---

**16.** The trouble with a societal behavior standard list like moral equivalency is who determines what is moral and what is equivalent and who judges the judges in either their definition or their usage? A Murphy Brown can either be a symbol or a symptom.

614, 48 Am.Rep. 658 (1884)): " 'It is not necessary that a jury, in order to find a verdict, should concur in a single view of the transaction disclosed by the evidence. If the conclusion may be justified upon either of two interpretations of the evidence, the verdict cannot be impeached by showing that a part of the jury proceeded upon one interpretation and part upon the other.' " Thus came to be the one crime—non-unanimity—sufficiency of the evidence adaptation for the unitary verdict which was in that case diligently attacked in dissent and has remained singularly challenged for further authentication ever since. Although *Sullivan* is cited in *Schad*, it is apparent that the rule of *Sullivan* is singularly different from the plurality moral equivalency, Justice Scalia's historical non-justification for non-unanimity and, of course, Justice White's rejection in dissent. The *Sullivan* rule in generic concept of a sufficiency of the evidence to justify, although the nature of the evidence may be somewhat differentiated, was the rule first extracted for dictum in *Cloman*, used in *Price*, and now authenticated in this case by the majority. That adaptation has no support in *Schad* nor in the Oregon, Colorado, or North Carolina cases and, furthermore, is not within the prior federal court law originally delineated in *Gipson*.

Frankly, I cannot find the *Sullivan* approach to fit within the long term historical Wyoming precedent either. For ninety-one years in this state, the constitutional requirement of a unanimous jury verdict in a criminal case has remained unquestioned. By analysis of Wyo. Const. art. 1, § 9, this court in *Foster*, 61 P. at 466–67, what yet today should not be in doubt, established that the unanimous jury verdict was constitutionally established:

> The courts have uniformly held also that the word "jury" as used in our constitutions, when not otherwise modified, means a common law jury composed of 12 men, whose verdict shall be unanimous. As stated by the supreme court of Minnesota: "The expression 'trial by jury' is as old as Magna Charta, and has obtained a definite historical meaning which is well understood by all English-speaking peoples; and for that reason no American constitution has ever assumed to define it. We are therefore relegated to the history of the common law to ascertain its meaning. The essential and substantive attributes or elements of jury trial are, and always have been, number, impartiality, and unanimity. The jury must consist of twelve. They must be impartial and indifferent between the parties; and their verdict must be unanimous." *Lommen v. Gaslight Co.*, 65 Minn. 196, 68 N.W. 53, 33 L.R.A. 437. * * * It is unquestioned, also, that at the adoption of the constitution the right existed in Wyoming as at common law; that is, in felonies and in all common-law cases in the district court—our court of general common-law jurisdiction—the right was to an impartial jury of 12 men and a unanimous verdict. * * * As to the right in criminal cases there is no room for construction. The language is express that it shall remain inviolate; that is, that a person charged with crime has the right, as heretofore, to demand a trial by 12 impartial men, whose verdict must be unanimous in order to support a judgment.

*See also Tobin*, 226 P. 681, where *Foster* is identically restated.

> *It is my conviction as a basic constitutional recognition that what this court in 1900 forbid to the legislature is now by tautology and phraseology inserted by this successor court into our system of justice to permit a non-unanimous verdict.*

Any supposition that premeditated murder and felony murder are the same or similar criminal offenses is absurd nonsense in this world's reality. *Lee*, 286 Cal. Rptr. 117; *Ortega*, 817 P.2d 1196. Fundamentally and factually, felony murder may occur when none of the factors of premeditated murder are present except the death of a human being. The real fact and resulting problem as recognized by Justice White in *Schad* is, like Arizona there and now here under the Wyoming statute which, for emphasis, justifies restatement:

[The statute] criminalizes several alternative patterns of conduct. While a State is free to construct a statute in this way, it violates due process for a State to invoke more than one statutory alternative, each with different specified elements, without requiring that the jury indicate on which of the alternatives it has based the defendant's guilt.

*Schad,* 111 S.Ct. at 2509. *Accord Com. v. Kickery,* 31 Mass.App.Ct. 720, 583 N.E.2d 869 (1991) and *State v. Lynch,* 327 N.C. 210, 393 S.E.2d 811 (1990).

Within the facts of this case, the first degree murder conviction is affirmed without knowing whether a single fact was unanimously determined by a majority of the jury, let alone unanimously by the jury except the admitted activity of Bouwkamp in his conduct as an accessory after the fact. Anything else determined in this decision cannot be actually demonstrated to have been the "jury decision." This is a supposition, inference and conjecture inelegantly coronated to be fact. Here, we rewrite the Wyoming Constitution to accept a non-unanimous jury verdict for first degree murder in order to justify affirming a most questionable conviction. Clear and precise language should not be reconstituted by applied attributions of moral equivalency, historical practice, or even "it must have been true" fact finding in appellate decision rendition.

Our 1984 case of *Fife v. State,* 676 P.2d 565 (Wyo.1984) is not completely inapposite. The case presented an amended information involving two forms of intent which provided three ways the jury could have found the defendant guilty of aggravated burglary, e.g., intent to steal, intent to commit aggravated assault or a combination of the two. In a second count, the defendant was convicted of aggravated assault and battery with a dangerous weapon. Although the case was emplaced in reversal on a sufficiency of evidence on any concept premise, it was concluded:

If both theories of intent submitted to the jury were sufficiently supported by the evidence, we could uphold the general verdict on the aggravated burglary

charge. * * * However, there was insufficient evidence as a matter of law to support the intent to assault element. We cannot uphold a general jury verdict when one of the alternate theories upon which the jury could have relied is in error.

*Fife,* 676 P.2d at 568. It was further said that:

If one of the alternate theories submitted to the jury is unsupported by substantial evidence, the general verdict must be set aside unless the court can ascertain that the verdict was founded upon a theory supported by substantial evidence. * * *

Submitting claims to the jury which have no foundation in the evidence allows the jury to engage in conjecture or to speculate as to the defendant's guilt. * * * Parties are entitled to proper instructions covering their respective theories *regarding the evidence submitted.*

*Id.* at 568–69 (emphasis in original and citing *Barber v. Sheridan Trust & Savings Bank,* 53 Wyo. 65, 78 P.2d 1101 (1938)).

If one has a modest attraction to logic and applied rationality, the invalidity of the attribution of parallelism to premeditated murder and felony murder to reach first degree murder is immediately apparent. The basic nature and carefully defined requirements for proof of premeditated murder are quite different from the proof of an intended felony from which by some result, accident, happenstance or pragmatic direction of willful intent, a death results. Furthermore, intrinsic in constitutional law within the character of the offenses, there are potentially lesser included offenses to premeditated murder of second degree or manslaughter and the affirmative response of self-defense. Conversely, there is not in most jurisdictions any lesser included offense for the felony murder charge and self-defense is not available to deny guilt. *Richmond v. State,* 554 P.2d 1217 (Wyo. 1976). *See, however, Thomas,* 386 S.E.2d 555 and Survey, David George Hester, *State v. Thomas: The North Carolina Supreme Court Determines That There Are Lesser Included Offenses of Felony Mur-*

*der,* 68 N.C.L.Rev. 1127 (1990). *See also Bills,* 220 N.W.2d 101, *rev'd on other grounds sub nom. People v. Dancer,* 396 Mich. 802, 238 N.W.2d 29 (1976), in following *People v. Carter,* 395 Mich. 434, 236 N.W.2d 500 (1975).

The curiosity is that in Bouwkamp, the jury was illogically provided a verdict of first degree murder, second degree murder, manslaughter, or not guilty without a special unanimity instruction or the separate premeditated or felony murder verdict decision. The non-separately defined felony murder crime *could not* permit a jury verdict of second degree murder or manslaughter, *McFarland v. State,* 579 N.E.2d 610 (Ind.1991), and the admitted accessory after the fact conduct of the defendant which created a presumptive felony murder conception within the instructions given *could not* have informatively justified any not guilty verdict. In realistic application of the facts with the conceded cover-up activities and non-relational felony status, Bouwkamp received a *directed verdict of guilty of first degree murder.*

The basic difference in the function of felony murder when compared to premeditated murder in the structure of homicide criminal law is demonstrated in the pragmatic unavailability by a definition of terms of the lesser included offense[17] or affirmative self-defense, *State v. Marks,* 226 Kan. 704, 602 P.2d 1344 (1979); *Bellcourt v. State,* 390 N.W.2d 269 (Minn.1986), and the more frequently analyzed lesser included offense instruction. *Smith v. State,* 259 Ark. 703, 536 S.W.2d 289 (1976); *McFarland,* 579 N.E.2d 610; *Newman v. State,* 485 N.E.2d 58 (Ind.1985); *State v. Chism,* 243 Kan. 484, 759 P.2d 105 (1988); *State v. Moore,* 580 S.W.2d 747 (Mo.1979); *State v. Dudrey,* 30 Wash.App. 447, 635 P.2d 750 (1981). *See also State v. Brad-*

shaw, 593 S.W.2d 562 (Mo.App.1979) and *State v. Handley,* 585 S.W.2d 458 (Mo. 1979) (where the conviction was reversed, when entered for second degree murder and the charge which had been submitted was felony murder, on the basis that second degree was not a lesser included offense and, without a formal accusation, the conviction could not be sustained).

Another differentiating factor arises in some cases from the vicarious responsibility of the co-participant where the decedent may not be an intended victim. *State v. Blackmon,* 587 S.W.2d 292 (Mo.App.1979), co-actor Willie Cordell was killed; *Moore,* 580 S.W.2d 747, a bystander fired the fatal shot; *Miers v. State,* 157 Tex.Crim. 572, 251 S.W.2d 404 (1952). See, however, the converse persuasion of *Redline,* 137 A.2d 472 and *Evans v. Com.,* 222 Va. 766, 284 S.E.2d 816 (1981), *cert. denied* — U.S. ——, 111 S.Ct. 309, 112 L.Ed.2d 295 (1990). The *Canola* cases are additionally informative to demonstrate the progression in New Jersey. *State v. Canola,* 73 N.J. 206, 374 A.2d 20 (1977); *State v. Canola,* 135 N.J.Super. 224, 343 A.2d 110, *cert. denied,* 69 N.J. 82, 351 A.2d 10 (1975). The interesting facet of the vicarious victim cases as noted above is the innate recognition of the implied malice which is transferrable in justification for premeditation for the first degree where the killing itself may be realistically accidental. See the confusion engendered in *People v. Till,* 80 Mich.App. 16, 263 N.W.2d 586 (1977), *rev'd in part,* 411 Mich. 982, 308 N.W.2d 110 (1981), based on inadequate record to show request for instruction.

The theory of transferred malice which is the centerpost of felony murder got lost in logical explanation why separate verdict forms should not be required.[18] A somewhat expansive walk through the forest of

---

**17.** *See Phillips v. Territory,* 1 Wyo. 82 (Wyo. 1872).

**18.** The simple fact, seldom stated, is that the unitary verdict approach permits a non-unanimous jury decision and consequent substantial prosecutorial benefit in reduced trial burden. Otherwise, most courts would be using the preferred separate verdict form immediately and uniformly. Actually, the advantage given to the prosecutor may not be morally inappropriate.

It is, however, in my opinion, just constitutionally unjustified. Wyo. Const. art. 1, §§ 6, 9 and 10. The constitutional protection to the accused is diminished from the designed shift of a significant trial proof responsibility away from the state. In interesting analysis, see James J. McGuire, Note, *Schad v. Arizona: Diminishing the Need for Verdict Specificity,* 70 N.C. L.Rev. 936 (1992).

cases provides a considerable education about why constitutional unanimity in the erroneous conception of some courts does not require a unanimous fact finding resolution by the jury. *See* Tim A. Thomas, Annotation, *Requirement of Jury Unanimity as to Mode of Committing Crime Under Statute Setting Forth the Various Modes by Which Offense May Be Committed,* 75 A.L.R.4th 91 (1990). *Cf.* Erwin S. Barbre, Annotation, *What Constitutes Termination of Felony for Purpose of Felony–Murder Rule,* 58 A.L.R.3d 851 (1974).

Arizona cases ultimately resting in the vesting of the law in the United States Supreme Court decision in *Schad,* 111 S.Ct. 2491 provide an interesting panorama. In *Schad,* 633 P.2d 366, no consideration was given to the unitary verdict submission. When the case reappeared in the Arizona Supreme Court in *Schad,* 691 P.2d 710, the issue considered was an improper instruction on felony murder. Error in the felony murder instruction was found and the court said:

> Since the jurors were given only one form of verdict for first degree murder, we cannot now determine whether they voted for first degree murder based on premeditation or on felony murder. The possibility that they convicted Schad of first degree murder based on the deficient instruction constitutes fundamental error.

*Id.* at 712. The defendant was then retried and the resulting case, *Schad,* 788 P.2d 1162 tells that again the unitary jury verdict had been employed.

The case first cited in recent time for Arizona law was *State v. Counterman,* 8 Ariz.App. 526, 448 P.2d 96 (1968), where the charge had been assault with a deadly weapon. The actual issue for the case was presented as a requested election with information and testimony providing indication of two separate assaults with a deadly weapon. The evidence revealed that a weapon was discharged twice during the assaultive offense. The court, in denying a requirement to elect, stated:

> [A] person has a constitutional right to be put on trial for a single offense, and

that he has a right to a unanimous jury verdict with reference to the criminal act for which he was tried. * * *

> The rule does not apply, however, "where a series of acts form part of one and the same transaction, and as a whole constitute but one and the same offense."

*Id.* 448 P.2d at 101 (quoting *People v. Jefferson,* 123 Cal.App.2d 219, 266 P.2d 564 (1954)).

The next case, *Axley,* 646 P.2d 268, resulted when the trial court had granted a directed verdict on premeditated murder and submitted the case by instruction on only felony murder. Consequently, the attack came on the indictment and not on the verdict. The subject of unanimity of a verdict was not considered. The relevant Arizona rule was then established in *Encinas,* 647 P.2d 624 where the first degree one-crime rule was applied rejecting the requirement for a unanimous decision of the jury on either the premeditation or felony murder constituents. This was a precise manner, one offense allocation to adjure requirement for unanimity in decision on the basic facts submitted for offense conviction. The non-election requirement was again addressed in the premeditation case of *State v. Walton,* 159 Ariz. 571, 769 P.2d 1017, *cert. granted,* 493 U.S. 808, 110 S.Ct. 49, 107 L.Ed.2d 18 (1989), *aff'd,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990) with no issue raised of unanimity in verdict presented. These cases in disruptive process and theory would not go away as then last illustrated by *State v. Smith,* 160 Ariz. 507, 774 P.2d 811 (1989), where the issue was raised by inconsistent verdicts after alternative forms of verdicts had been used. The jury found defendant guilty of felony murder, not guilty of premeditated murder and the court said in recognition which subsequently reappeared as a quotation in *Schad,* 111 S.Ct. 2491:

> Thus, as a matter of sound administration of justice and efficiency in processing murder cases in the future, we urge trial courts, when a case is submitted to a jury on alternate theories of premeditated and felony murder, to give alter-

nate forms of verdict so the jury may clearly indicate whether neither, one, or both theories apply.

*Smith*, 774 P.2d at 817. One could realistically anticipate that by now the word has gone forth and that in the state of Arizona, *Schad* and *Encinas* will not again reoccur. Unfortunately, what is no longer the status in Arizona becomes what reoccurs in Wyoming. By misunderstanding the current progression of the law, this court will not now provide a thoughtful analysis for the logical development for our own law.

The cited Washington case, *State v. Whitney*, 108 Wash.2d 506, 739 P.2d 1150 (1987), holds, that at least for rape, unanimity was not necessary if each charged alternative is supported by "substantial evidence"; whether by use of deadly weapon or by kidnapping. The court recognized that threatened use of a deadly weapon and kidnapping were different crimes, but not necessarily different offenses. The court then said:

Petitioner concedes that substantial evidence supports both the kidnapping and the use or threatened use of a deadly weapon. Because constitutionally sufficient evidence supports both charged alternatives, the lack of jury unanimity does not entail the danger present in *Green* II that any of the jury members may have based their finding of guilt on an invalid ground. *See [State v.] Green* II, 94 Wash.2d [216] at 232, 616 P.2d 628; *[State v.] Ellison*, 36 Wash.App. [564] at 575, 676 P.2d 531. *We agree that an instruction on jury unanimity as to the alternative method found is preferable because it eliminates potential problems which may arise when one of the alternatives is not supported by substantial evidence; however, we conclude that such an instruction was not required in this case.*

*Id.* 739 P.2d at 1153 (emphasis added). Washington now appears, at least for this type of case, to adopt a "sufficiency of the evidence that the jury could have found" rule. It was not always that way.

In *State v. Golladay*, 78 Wash.2d 121, 470 P.2d 191, 201 (1970), involving felony murder and premeditated murder, the court had said in reversing the conviction and remanding for retrial:

Thus, a defendant may be charged with committing a single crime in two or more ways and proof of one will uphold the indictment or information. But before the jury can be instructed on and allowed to consider the various ways of committing the crime alleged, there must be sufficient evidence to support the instructions. Moreover, the instructions must clearly distinguish the alternative theories and require the necessity for a unanimous verdict on either of the alternatives. When such is the case, the prosecutor need not be forced to elect, for fear that half of the jury will find the defendant guilty on one theory and half on another theory.

*Golladay* lasted until *State v. Arndt*, 87 Wash.2d 374, 553 P.2d 1328 (1976) where the *"Golladay* dictum" was overruled in a larceny by fraudulent receipt of public assistance case with a new rule of mutual repugnancy then being created. This rule was, as described by the dissent, built on a "faulty foundation[ ]", to-wit: the title of the act. *Arndt*, 553 P.2d at 1336, Brachtenbach, A.J., dissenting. That dissent found the prior state law to have been:

"An accused is entitled to the concurrence of twelve jurors upon one definite charge of crime." * * *

The jury should have been instructed that they must be unanimous in finding beyond a reasonable doubt that the defendant committed one or more of the acts charged.

*Id.* at 1339 (quoting *State v. Oswald*, 306 S.W.2d 559, 563 (Mo.1957)). *See also State v. Wixon*, 30 Wash.App. 63, 631 P.2d 1033, 1040 (1981), which also followed the repugnancy rule.

With the *Arndt* split court decision in place, the *Green* cases followed. *State v. Green*, 91 Wash.2d 431, 588 P.2d 1370 (1979) (*Green I* ) and *State v. Green*, 94 Wash.2d 216, 616 P.2d 628 (1980) (*Green II* ), involving a capital penalty murder con-

viction. Assessed for an error contention in *Green* I was conviction of aggravated murder by alternative means without requiring a unanimous verdict. The alternative aggravating offenses of rape and kidnapping were presented. The decision provided a requirement of substantial evidence of both crimes when a single killing involved theories of both felony murder and premeditated murder.

We are satisfied that there exists substantial evidence from which the jury could infer appellant killed while in the course of or in furtherance of the statutorily defined offense of kidnapping. Appellant does not challenge the sufficiency of the evidence regarding rape. Thus, since there is substantial evidence of both circumstances, applying *Arndt,* it was not error to instruct the jury in the alternative.

*Green* I, 588 P.2d at 1377.

However, the *Green* I substantial evidence rule was then discarded in *Green* II to permit adoption of a reasonable doubt rule.

Accordingly, the appropriate test for determining the sufficiency of the evidence of kidnapping is *not* that applied in *Green* I, *i.e.,* whether, after viewing the evidence most favorable to the State, there is substantial evidence to support kidnapping. The issue, as framed in *Jackson v. Virginia,* [443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)], is whether, after viewing the evidence most favorable to the State, *any rational trier of fact* could have found the essential elements of kidnapping *beyond a reasonable doubt.*

*Green* II, 616 P.2d at 632 (emphasis in original). In making the progression, the Washington court followed *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) and *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068. The court applied as a rule and concept:

We agree with Green's contention that absent a separate unanimous verdict on *each* of the two critical elements of aggravated murder in the first degree, it is impossible to determine whether the jury found unanimously that he committed either rape or kidnapping or both.

\*     \*     \*     \*     \*     \*

In the instant case, the jury instructions and verdict form did not require the jury to unanimously find appellant committed or attempted to commit either first degree kidnapping or rape or both. As instructed, it was possible for the jury to have convicted Green with six jurors resting their belief of guilt upon kidnapping and the other six resting their belief upon rape. Thus, it is impossible to know whether the jury unanimously decided that the element of rape had been established beyond a reasonable doubt.

*Green* II, 616 P.2d at 638 (emphasis in original). Consequently, the case was reversed for retrial. This review of the Washington cases does not provide much stature or structure to justify either the moral equivalency of the *Schad* plurality or the historical justification of due process (Justice Scalia's special concurrence). The complexity created for the law by the incongruities of differentiated rules becomes self-evident.[19]

The case law of California which is the most extended among the jurisdictions is also the most confused. In pathway where nearly every direction can be found from

---

**19.** See, as a further example, *State v. Loehner,* 42 Wash.App. 408, 711 P.2d 377 (1985), which addressed the similar subject of differentiated incidents within the criminal charge and defendant's denial of a requested election for prosecution. The court stated by quotation from *State v. Petrich,* 101 Wash.2d 566, 572, 683 P.2d 173 (1984):

"When the evidence indicates that several distinct criminal acts have been committed, but defendant is charged with only one count of criminal conduct, jury unanimity must be protected.... The State may, in its discretion, elect the act upon which it will rely for conviction. Alternatively, if the jury is instructed that all 12 jurors must agree that the same underlying criminal act has been proved beyond a reasonable doubt, a unanimous verdict on one criminal act will be assured. When the State chooses not to elect, this jury instruction must be given to ensure the jury's understanding of the unanimity requirement."
*Loehner,* 711 P.2d at 378.

*People v. Castro,* 133 Cal. 11, 65 P. 13 (1901); *Chavez,* 234 P.2d 632; *People v. Nye,* 63 Cal.2d 166, 45 Cal.Rptr. 328, 403 P.2d 736 (1965), *cert. denied,* 384 U.S. 1026, 86 S.Ct. 1960, 16 L.Ed.2d 1033 (1966); and then *People v. Milan,* 9 Cal.3d 185, 107 Cal.Rptr. 68, 507 P.2d 956 (1973) from which as a distillation of *Chavez,* unanimity as a constitutional concept for conviction of a criminal offense was not presented. This non-unanimity criteria in California case law ran into trouble fairly rapidly resulting in reversal in both *People v. Alva,* 90 Cal. App.3d 418, 153 Cal.Rptr. 644 (1979) and then *People v. Diedrich,* 31 Cal.3d 263, 182 Cal.Rptr. 354, 643 P.2d 971 (1982). The immediate watershed case came in *People v. Dillon,* 34 Cal.3d 441, 194 Cal.Rptr. 390, 668 P.2d 697 (1983) which touched the tender nerve of consistency when the basic examination of felony murder in constitutional concepts was the issue presented. For the purpose of that resolution, the California Supreme Court said:

> It follows from the foregoing analysis that the two kinds of first degree murder in this state differ in a fundamental respect: in the case of deliberate and premeditated murder with malice aforethought, the defendant's state of mind with respect to the homicide is all-important and must be proved beyond a reasonable doubt; in the case of first degree felony murder it is entirely irrelevant and need not be proved at all. From this profound legal difference flows an equally significant factual distinction, to wit, that first degree felony murder encompasses a far wider range of individual culpability than deliberate and premeditated murder. It includes not only the latter, but also a variety of unintended homicides resulting from reckless behavior, or ordinary negligence, or pure accident; it embraces both calculated conduct and acts committed in panic or rage, or under the dominion of mental illness, drugs, or alcohol; and it condemns alike consequences that are highly probable, conceivably possible, or wholly unforeseeable.

*Dillon,* 668 P.2d at 719 (footnote omitted).

The two offense delineation of *Dillon* then easily disappeared in *People v. Guer-ra,* 40 Cal.3d 377, 220 Cal.Rptr. 374, 708 P.2d 1252 (1985); *see People v. Schultz,* 192 Cal.App.3d 535, 237 Cal.Rptr. 513, 516 (1987), with progression that led to *People v. Sanders,* 51 Cal.3d 471, 273 Cal.Rptr. 537, 558, 797 P.2d 561, 582 (1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2249, 114 L.Ed.2d 490 (1991), where the court escaped from requiring reversal with the concept of harmless error that "the jury reached its verdict of first degree murder under one legally proper theory." Before reaching that startling concept of unanimity in jury decision and constitutionality regarding unproven guilt, the court had related:

> The People presented the jury with six potential first degree murder theories. In addition to being instructed that it should return a verdict of first degree murder if it found defendant premeditated and deliberated the killing, or killed during a robbery, the jury was also instructed that it could return a verdict of first degree murder if it found the murder was committed during a burglary in which defendant entered Boender's home with the intent to (1) steal, (2) commit an assault, (3) falsely imprison the victims, or (4) dissuade the victims from testifying.

> Defendant correctly contends, and the People now concede, that it was error to instruct the jury that it might convict of first degree murder if it found the killing occurred during a burglary in which defendant's intent was to commit an assault. "In *[People v.] Ireland,* [70 Cal.2d 522, 75 Cal.Rptr. 188, 450 P.2d 580 (1969)], we rejected the bootstrap reasoning involved in taking an element of a homicide and using it as the underlying felony in a second degree felony-murder instruction. We conclude that the same bootstrapping is involved in instructing a jury that the intent to assault makes the entry burglary and that the burglary raises the homicide resulting from the assault to first degree murder without proof of malice aforethought and premeditation." (*People v. Wilson* (1969) 1

Cal.3d 431, 441, 82 Cal.Rptr. 494, 462 P.2d 22.) We thus concluded that "a burglary based on intent to assault ... cannot support a felony-murder instruction." (*Ibid.;* see also *People v. Smith* (1984) 35 Cal.3d 798, 804, 201 Cal.Rptr. 311, 678 P.2d 886.)

Although the instruction was erroneous, we agree with the People that the error did not prejudice defendant. The jury was presented with five legally permissible theories of guilt and one legally impermissible theory. In such circumstances, the applicable rule on appeal is clear: reversal is required only if the reviewing court cannot determine from the record on which theory the jury relied.

*Id.* 273 Cal.Rptr. at 557–58, 797 P.2d at 581–82.

The progression in case law then came recently to *People v. Johnson,* 233 Cal. App.3d 425, 284 Cal.Rptr. 579 (1991) where the appellate court determined that pleading premeditated murder suffices for conviction of felony murder by a most interesting logical conceptualization:

Defendant errs in interpreting *Dillon* as holding that felony murder and premeditated murder are two distinct crimes. (*People v. Scott* (1991) 229 Cal. App.3d 707, 713, 280 Cal.Rptr. 274.) *Dillon* treats felony murder and premeditated murder as "two kinds of first degree murder" requiring different elements of proof. (*People v. Dillon, supra,* 34 Cal.3d at pp. 476–477, 194 Cal.Rptr. 390, 668 P.2d 697.) The language defendant quotes from the opinion ("the two kinds of murder are not the 'same' crimes") (*id.* at p. 476, fn. 23, 194 Cal.Rptr. 390, 668 P.2d 697) was merely employed to refute Dillon's "narrow equal protection argument" that defendants charged with felony murder, unlike those charged with premeditated murder, are not allowed to reduce their degree of guilt by evidence negating the element of malice. (*Ibid.*)

*Johnson,* 284 Cal.Rptr. at 595. *See, however, People v. Kelly,* 1 Cal.4th 495, 3 Cal. Rptr.2d 677, 822 P.2d 385 (1992), which is even more recent where the appellate court

"can determine" one correct theory rule was applied.

Reconstruction of this pathway through this sample of the many California cases is not taken to illustrate lack of logical consistency. Rather, it is done to demonstrate that taking the different offenses of premeditated murder and felony murder and factually stating that they are the same is, in actuality, not true regardless of the source of frequently cited authority to the contrary. The majority decision in this case is not made reliable by either honoring the Wyoming Constitution or adaptation of *Schad,* 111 S.Ct. 2491.

To say that these two crimes, premeditated murder and felony murder, are the same offense is no different than asserting that the some fifty-four capital offenses proposed to be created in crime control federal legislation now pending in Congress are one crime. If it is to be one crime because one penalty can result and only that identity, then to assert under present Wyoming law many combinations of aggravated crimes which are not capital offenses are likewise one crime which as a matter of fact would include manslaughter, aggravated homicide by vehicle, sexual assault in the second degree, aggravated robbery, aggravated blackmail, arson, first degree and aggravated burglary, while another crime would be aggravated kidnapping and second degree murder. It was this incongruity that required Justice Souter to create the test of moral equivalency. *Schad,* 111 S.Ct. 2491. Rationally and logically our creation of more of this result-oriented imaginary structure where factual underpinning is lacking really makes no sense. It would be far better if we would look at cases with a dual verdict finding, as for example, *United States v. Sides,* 944 F.2d 1554, 1557–58 n. 3 (10th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 604, 116 L.Ed.2d 627 (1991) (emphasis in original), where the opinion offered by Judge Brorby recognized the definitive advantage of specific decision in a case where the differentiated jury conclusions were established by the verdict:

Due to commendable thoroughness, the Special Interrogatory also confirms

that each finding of first degree murder is supported by the jury's conclusion that "the Defendant * * * is guilty of murder in the first degree, *including* malice aforethought...."

In a case providing "a 'conscientious' and sophisticated jury" and a pastiche of discreet acts where a unanimity instruction was considered, the New Jersey Supreme Court adopted the instruction on request criteria where there was danger of a fragmented verdict:

> Ordinarily, a general instruction on the requirement of unanimity suffices to instruct the jury that it must be unanimous on whatever specifications it finds to be the predicate of a guilty verdict. There may be circumstances in which it appears that a genuine possibility of jury confusion exists or that a conviction may occur as a result of different jurors concluding that a defendant committed conceptually distinct acts. We hold that when there is such a danger of a fragmented verdict, the court must instruct a jury, on request, that if a guilty verdict is returned, the jury must be unanimous on the underlying facts. Such a charge was not requested here. We are satisfied that in the circumstances of this case, there was no genuine possibility of jury confusion about its responsibility unanimously to find defendant guilty of official misconduct on the specifications charged.

*State v. Parker*, 124 N.J. 628, 592 A.2d 228, 234, 235 (1991).

Some thought is required regarding the comments in dissent by Justice Pollock, who also recognized the ultimate test to be a genuine potential for jury confusion, and then followed the conceptual distinct approach of *Gipson* as well as the *Schad* analytical limitations of conceptual distinction test:

> Because the rule requiring a unanimous verdict of guilt in criminal trials is "fundamental," doubt about the jury's consensus strikes at the heart of a defendant's right to a fair trial. * * * I agree with the majority that generally the trial court must give a specific unanimity instruction when confronted with the dan-

ger of a fragmented verdict. * * * I differ, however, with the application of that rule to this case.

*Parker*, 592 A.2d at 235.

The extended discussion in dissent, as well as in the majority, and the common recognition that the effort was a deprivation of the defendant's fundamental right to be convicted based only on proof of specific illegal acts, came within a plain error review since an instruction had not been requested. Furthermore, no *Schad* verdict issue was presented at all. Conversely, or even perhaps compatibly, the majority defined the issue in terms of the politics enfolded decision writing in the *North* case:

> The celebrated case of Oliver North highlights this issue. *United States v. North*, 910 F.2d 843 (D.C.Cir.) (*North I*), *vacated in part and rev'd in part on rehearing*, 920 F.2d 940 (D.C.Cir.1990) (*North II*), *cert. denied*, —— U.S. ——, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991), and *cert. denied*, —— U.S. ——, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991). North had requested specific unanimity instructions from the trial court and had objected to the trial court's refusal to give such instructions.

*Parker*, 592 A.2d at 232.

Furthermore, this was not a non-unanimous instruction case:

> This is not a case in which a court incorrectly stated general principles. The "jury instructions cannot be read as sanctioning a nonunanimous verdict." *State v. Jennings*, 216 Conn. 647, 663, 583 A.2d 915, 924 (1990). The court correctly instructed the jury that it must be unanimous in its verdict. The core question is, in light of the allegations made and the statute charged, whether the instructions "as a whole [posed] 'a genuine risk that the jury [would be] confused.'" *North II, supra,* 920 F.2d at 951 (quoting *United States v. Duncan, supra,* 850 F.2d [1104] at 1114) [ (6th Cir.1988) ].

*Id.* 592 A.2d at 233–34. *Cf. State v. Dechaine*, 572 A.2d 130 (Me.), *cert. denied*, —— U.S. ——, 111 S.Ct. 156, 112 L.Ed.2d 122 (1990); *State v. Walsh*, 558

A.2d 1184 (Me.1989); and *State v. Allard,* 557 A.2d 960 (Me.1989), where alternative verdict forms were used and a one-crime conviction was subsequently affirmed.

The law in Connecticut, which has been given substantial attention, also considers whether an instruction was given to sanction a non-unanimous verdict, and if not, then the matter is at an end if apparently a general unanimous instruction of some kind had been given. This is the specific converse of the *Parker* rule found in the New Jersey case.

On the merits, we have not required a specific unanimity charge to be given in every case in which criminal liability may be premised on the violation of one of several alternative subsections of a statute. We have instead invoked a multipartite test to review a trial court's omission of such an instruction. We first review the instruction that was given to determine whether the trial court has sanctioned a nonunanimous verdict. If such an instruction has not been given, that ends the matter. Even if the instructions at trial can be reasoned to have sanctioned such a nonunanimous verdict, however, we will remand for a new trial only if (1) there is a conceptual distinction between the alternative acts with which the defendant has been charged, and (2) the state has presented evidence to support each alternative act with which the defendant has been charged.

*State v. Famiglietti,* 219 Conn. 605, 595 A.2d 306, 313 (1991).

Iowa has built its non-unanimity requirement structure on a thesis of non-repugnancy of felony murder and premeditation, *Gavin v. State,* 425 N.W.2d 673 (Iowa App. 1988), and that first degree murder is a unitary offense not requiring separate consideration whether achieved by premeditation or the augmentation of felony participation. *State v. Fuhrmann,* 257 N.W.2d 619 (Iowa 1977); *State v. Nowlin,* 244 N.W.2d 596 (Iowa 1976). See also the ineffectiveness of counsel inquiry in *Gavin,* 425 N.W.2d 673. The Iowa court adopted a repugnancy-substantial evidence test to avoid the unanimous content of the verdict requirement. *State v. Duncan,* 312 N.W.2d 519 (Iowa 1981).

The second question is whether the jury had to be unanimous on guilt with respect to the boat or with respect to the marina, or whether the jury could find defendant guilty of burglary by a combination of votes respecting the marina or the boat. A unanimous verdict is of course required in this kind of case. * * *

At this point another principle intervenes. "It is not necessary that a jury, in order to find a verdict, should concur in a single view of the transaction disclosed by the evidence. If the conclusion may be justified upon either of two interpretations of the evidence, the verdict cannot be impeached by showing that a part of the jury proceeded upon one interpretation and part upon another." *People v. Sullivan,* 173 N.Y. 122, 127, 65 N.E. 989, 989 (1903). Stated differently, "[I]f substantial evidence is presented to support *each* alternative method of committing a single crime, and the alternatives are not repugnant to each other, then unanimity of the jury as to the mode of commission of the crime is not required." *State v. Arndt,* 12 Wash. App. 248, 252, 529 P.2d 887, 889 (1974).

*Id.* at 523 (emphasis in original). The problem in concept is that the specific statement made regarding Washington precedent is no longer the law in that jurisdiction.

The Michigan court in the second of two *Embree* cases, *People v. Embree,* 70 Mich. App. 382, 246 N.W.2d 6, 8 (1976), affirmed on the instructional issue by a finding of overwhelming evidence of both premeditation and felony murder, and then added:

We would be remiss if we did not bring to the attention of the bench and bar the fact that good practice would require a trial judge to instruct the jury that its decision must be unanimous as to whether the murder was premeditated or whether it occurred as an incident of defendant's participation in one of the enumerated felonies.

The Michigan judiciary now apparently recognizes the admonition earlier given. *See People v. Zeitler*, 183 Mich.App. 68, 454 N.W.2d 192 (1990), where the conviction was of first degree premeditated murder and also first degree felony murder with one sentence imposed.

In another instruction case, which is frequently cited, *Holland*, 280 N.W.2d 288, the issue related to direct commission or aiding and abetting or conspiracy and resulted in guilt of second degree murder. Although some broad discussion of authorities, including *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068 and *Gipson*, 553 F.2d 453, is included, *Sullivan*, 65 N.E. 989, which is converse, was also cited with equal approval. The *Holland* court then said unanimity is required only with respect to the ultimate issue of the defendant's guilt or innocence of the crime charged and unanimity is not required with respect to the alternative means or ways which the crime can be committed.

The party to the crime statute, as *Holland*, cannot be compared to the proven malice and presumed intent differentiation involved in the issues of present concern. The law of Wisconsin, by examination in *Manson v. State*, 101 Wis.2d 413, 304 N.W.2d 729, 737 (1981), applied the *Gipson* concept:

> The constitutional right to a unanimous jury verdict exists under both the United States and Wisconsin Constitutions. *See State v. Baldwin*, 101 Wis.2d 441, 446 n. 3, 304 N.W.2d 742 (1981). The nature and scope of that right, however, are not well defined and have been receiving increased attention by the courts and commentators in recent years. The leading case discussing the question of jury unanimity is *United States v. Gipson*, 553 F.2d 453 (5th Cir.1977).

By footnote, the court stated that the *Gipson* analysis had been adopted for determining whether the defendant's right to a unanimous verdict was violated. *Manson*, 101 Wis.2d 413, 304 N.W.2d at 737 n. 6.

Justice Abrahamson, in the thoughtful and scholarly special concurrence, recognized the advantage of a unanimity instruction on the mode of committing the offense. *See also* John R. Baumgarth, Note, *Application of Gipson's Unanimous Verdict Rationale to The Wisconsin Party to a Crime Statute—Holland v. State, 91 Wis.2d 134, 280 N.W.2d 288 (1979)*, 1980 Wis.L.Rev. 597 (1980); Sally Wellman, Note, *Constitutional Law—Criminal Procedure—Jury Instructions and the Unanimous Jury Verdict*, 1978 Wis. L.Rev. 339 (1978); and Gary N. Gibbs, Note, *United States v. Gipson: Duplicity Denies Right to Unanimous Verdict*, 1978 Det. C.L.Rev. 319 (1978).

Generally, the issue is presented either to consider the unanimous decision jury instruction or regarding the dual or unitary verdict form where the case may present concepts of either distinguishable methods of crime commission or diverse events in course of the occurrence. It is apparent that the discussions intermix without regard for which concept is considered. For example, the Ohio Supreme Court recognized the danger of the " 'patchwork' or less than unanimous verdict * * *" in *State v. Johnson*, 46 Ohio St.3d 96, 545 N.E.2d 636, 645 (1989), *cert. denied*, 494 U.S. 1039, 110 S.Ct. 1504, 108 L.Ed.2d 639 (1990). The robbery involvement in the felony murder death was sufficiently defined to avoid any potential for jury confusion.[20]

The converse law is illustrated by Oklahoma in the candy store robbery case of *James v. State*, 637 P.2d 862 (Okl.Cr.1981), which produced a felony murder and malice aforethought killing with a resulting unitary verdict of first degree murder and a life sentence. The Oklahoma court followed the ostensible authority of a Colorado case, *People v. Taggart*, 621 P.2d 1375 (Colo.1981), and the since-reversed Oregon case of *Hazelett*, 492 P.2d 501, to uphold the requirement that only "the verdict

---

**20.** The trouble that the unitary first degree murder concept makes when questions of a lesser included offense are applied to felony murder is singularly demonstrated in the case of *Thomas*,

386 S.E.2d 555. *See also Huffman v. State*, 543 N.E.2d 360 (Ind.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 3257, 111 L.Ed.2d 767 (1990).

must be unanimous as to guilt or innocence of murder in the first degree but that they need not reach a unanimous decision on its foundation in either felony murder or premeditated murder." *James*, 637 P.2d at 866. *James* also cited two other cases, *Wilson*, 552 P.2d 931 and *Wells v. Com.*, 561 S.W.2d 85 (Ky.1978). However, the adjudicatory fact finding was made "[h]aving examined these decisions, and having found that the State did prove both premeditation and felony-based murder, this Court finds that the failure of the jury to indicate the basis of their finding of guilt was not error." *James*, 637 P.2d at 866. *See also Newsted v. State*, 720 P.2d 734 (Okl.Cr.), *cert. denied*, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986), which was a death penalty case involving a shooting of a taxicab driver in the back of his head in conjunction with an admitted robbery.

Since the Oklahoma court relied principally on two cases, the Oregon case since reversed and the *Taggart* case from Colorado, reference to Colorado law is required. In regard to *Taggart*, a close examination cannot sustain the broad application asserted. The case involved the death of a child and the court first said that " 'evidence of any of the alternative ways that a crime can be committed will support a general verdict.' " *Taggart*, 621 P.2d at 1387 (quoting *Hernandez v. People*, 156 Colo. 23, 30, 396 P.2d 952, 955 (1964)). The *Taggart* court then stated:

> The record indicates that the defendant did not object to the elemental instruction on child abuse, failed to request a special verdict, and did not assert his present challenge to the general verdict in his motion for a new trial. Under such circumstances "we are not inclined to hold that the general instruction on the necessity of unanimity was insufficient."

*Taggart*, 621 P.2d at 1387 (quoting *United States v. Pavloski*, 574 F.2d 933, 936 (7th Cir.1978)). Incidentally, the court in footnote distinguished *Gipson*, 553 F.2d 453 as "inapposite" in stating:

> Subsequent federal cases have found *Gipson* inapplicable where the jury is not specifically instructed on non-unanimity but is instructed on the alternative methods of committing a crime and on the requirement of a unanimous verdict. *United States v. Pavloski*, 574 F.2d 933 (7th Cir.1978); *United States v. Bolts*, 558 F.2d 316 (5th Cir.1977), *cert. denied*, 439 U.S. 898, 99 S.Ct. 262, 58 L.Ed.2d 246 (1978). State courts consistently have held that unanimity is required only with respect to the ultimate issue of the defendant's guilt or innocence of the crime charged and not with respect to alternative means by which the crime was committed.

*Taggart*, 621 P.2d at 1387 n. 5.

The other Colorado authority does not provide more well documented and compelling authority. The special concurrence of Justice Lohr in the four-three decision of *People v. Marquez*, 692 P.2d 1089, 1104–05 (Colo.1984) (footnote omitted and emphasis added), in following *Gipson* and rejecting *Sullivan*, addressed the subject with persuasion:

> In *People v. Ledman*, 622 P.2d 534 (Colo.1981) and *People v. Taggart*, 621 P.2d 1375 (Colo.1981), we addressed this issue. In both cases, however, we noted that the defendant had failed to object during the proceedings to an instruction inviting a general verdict, and under those circumstances held that a general instruction on the necessity of unanimity was sufficient. Implicit in those decisions is the principle that a defendant has a right to request a verdict form that identifies the method of commission of the crime, at least where the alternative methods encompass conceptually distinct and different combinations of material acts and culpable mental states. In the case now before us, the defendant made such a timely request, and the trial court erred in refusing to grant it.
>
> The defendant was charged with commission of aggravated robbery in alternative ways which, although not necessarily mutually exclusive under the facts of this case, involve combinations of conduct and mental culpability elements that are conceptually distinct and different from each other. First, he could have

been found guilty based on a jury determination that he was armed with a deadly weapon and intended, if resisted, to kill, maim or wound another person. § 18–4–302(a), 8 C.R.S. (1978). Second, the defendant could have been found to have committed aggravated robbery because he knowingly wounded or struck another person with a deadly weapon. § 18–4–302(b), 8 C.R.S. (1978). Finally, the defendant's guilt could have been bottomed on a determination that he knowingly put a person in reasonable fear of death or bodily injury by the use of force, threats, or intimidation with a deadly weapon. § 18–4–302(b), 8 C.R.S. (1978). The second and third methods of elevation of the crime of robbery to the more serious offense of aggravated robbery involve acts additional to the mere possession of a deadly weapon required under the first method. The first method requires specific intent, a more culpable mental state than the knowing conduct required to support conviction under the second and third.

It is implicit in *Ledman* and *Taggart* that the defendant was entitled to submission of special verdict forms to the jury upon timely request. Under the circumstances of this case, I believe that, in order to have found the defendant guilty of aggravated robbery, the jury should have been required to agree unanimously upon the essential acts and mental state upon which their verdict was based. By holding otherwise, the majority greatly dilutes the unanimous jury verdict right guaranteed to the defendant by section 16–10–108, 8 C.R.S. (1978), and Crim.P. 23(a)(8) and 31(a)(3).

In reaching this conclusion, I am aware that there are decisions from other states that would permit the sort of *patchwork verdicts* I would find impermissible. *See, e.g., People v. Sullivan,* 173 N.Y. 122, 65 N.E. 989 (1903). I believe, however, that the better reasoned approach is to be found in Judge Wisdom's opinion in *United States v. Gipson,* 553 F.2d 453 (5th Cir.1977), reversing a conviction because of a trial court instruction to the jury that they could convict if all agreed that the defendant was guilty of the offense charged even if in disagreement as to the acts of the defendant upon which their conclusion of guilt was predicated. As the Fifth Circuit Court of Appeals there stated:

> "Like the 'reasonable doubt' standard, which was found to be an indispensable element in all criminal trials in *In re Winship,* 1970, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368, the unanimous jury requirement 'impresses on the trier of fact the necessity of reaching a subjective state of certitude on the facts in issue.' "

Furthermore, the broad statement in footnote in *Taggart* was then re-examined by a further footnote in the more current case of *James v. People,* 727 P.2d 850, 855 n. 4 (Colo.1986), wherein it was stated:

> We have made a general statement in several cases involving alternative theories of criminal culpability that evidence establishing any one alternative will support a general verdict. *People v. Marquez,* 692 P.2d at 1100; *People v. Ledman,* 622 P.2d at 541; *People v. Taggart,* 621 P.2d at 1387; *Hernandez v. People,* 156 Colo. 23, 30, 396 P.2d 952, 955 (1964). Those cases addressed the unanimous verdict question and were not focused on the constitutional requirement that proof beyond a reasonable doubt is necessary to sustain a conviction. We did not mean to imply in those cases that an alternative theory could be submitted to a jury without adequate evidence to support it. To the extent that such an implication is to be found in that language, we reject it as contrary to the requirements of due process of law. *See, e.g., In re Winship; People ex rel. Juhan v. District Court* [165 Colo. 253, 439 P.2d 741 (1968) ].

Continuing in text, the *James* court stated:

> We agree that unless the evidence on each of the alternative methods of causing the victim's submission is sufficient to support a verdict by proof beyond a reasonable doubt, there can be no assur-

ance that the general verdict is based upon that constitutional standard mandated by the due process clauses of both the federal and state constitutions. As we stated in *People v. Lowe*, 660 P.2d 1261 [1271] (Colo.1983), "[i]f the jury is asked only for a general verdict [when the prosecution is based on alternative methods of committing a crime], then on appeal there is no way to decide upon which theory the jury reached its verdict. In such a case an error relating to either count would void the entire verdict."

*Id.* at 853.

The progression as a defined requirement for separate verdicts for Colorado as initiated in *Lowe*, 660 P.2d 1261 was restated in *Freeman*, 668 P.2d 1371 and then most recently recognized in *O'Neill*, 803 P.2d 164. In *Freeman*, 668 P.2d at 1381, the court said:

We conclude therefore that although the denial of the defendant's motion to compel an election is not error, dual convictions and sentences may not be entered on the murder after deliberation and felony murder counts with respect to each killing. The proper procedure to be followed on remand is as we stated in *Lowe:*

"If there is sufficient evidence in the record, all theories charged should be submitted to the jury for a special verdict. The jury should be informed that the defendant is charged with one crime, first-degree murder. The jury's special verdict should indicate which theories of first-degree murder, if any, have been proved by the evidence." 660 P.2d at 1271.

Kansas law likewise requires comparison between the older rule and the more realistic, present understanding. *See Wilson*, 552 P.2d at 935–36, where the court said:

This being the case it follows that the question is one of proof necessary to support a verdict of first degree murder. When an accused is charged in one count of an information with both premeditated murder and felony murder it matters not whether some members of the jury arrived at a verdict of guilt based on proof of premeditation while others arrive at a verdict of guilt by reason of the killer's malignant purpose. In such case the verdict is unanimous and guilt of murder in the first degree has been satisfactorily established. If a verdict of first degree murder can be justified on either of two interpretations of the evidence, premeditation or felony murder, the verdict cannot be impeached by showing that part of the jury proceeded upon one interpretation of the evidence and part on another.

The above holding meets with general acceptance in other jurisdictions in the absence of a statute which requires the jury to agree to the mode in which a murder was committed.

More recently, however, the Kansas court, in addressing the same structural concern involved in the law of unanimity, stated:

We believe, however, that it is appropriate to address the matter as it could arise again in a retrial herein. The defense cites cases dealing with a trial court's duty to instruct on all lesser included offenses pursuant to K.S.A.1987 Supp. 21–3107(3). Involuntary manslaughter was a charged crime, not a lesser included offense herein. Likewise, this does not involve an amendment of an information by the State. Rather, the effect was the trial court deleted part of the charge on its own motion.

Inasmuch as the involuntary manslaughter charge in the information was one count alleging two different means of commission, presumably the instruction and verdict form would have presented the whole charge to the jury without the court's intervention. Hence, had defendant been convicted of involuntary manslaughter, it would be impossible to determine which means of commission the jury had found occurred. A challenge to the sufficiency of the evidence supporting the conviction would reveal this problem.

We believe that the proper method to be employed would be to charge the two different alleged means of commission as

alternative counts of involuntary manslaughter. This would separate the elements instructions and the verdict forms and enable a reviewing court to determine precisely what the jury found. Further, it would prevent the jury from hybridizing the two means into some means of commission not specified in the statute defining involuntary manslaughter.

*State v. Prouse,* 244 Kan. 292, 767 P.2d 1308, 1314 (1989).

The current awareness of the more appropriate process is demonstrable in the recent case from New Mexico, *Ortega,* 817 P.2d 1196, where the jury was presented the issues in a special dual verdict form and found the defendant not guilty of premeditated murder, but in each case guilty of felony murder. *See also* Barbara L. Lauer, Comment, *Jury Agreement and the General Verdict in Criminal Cases,* XIX Land & Water L.Rev. 207 (1984).

In appellate responsibility, we do little credit to ourselves or provide moral substance in our responsibility for government by a process of recognizing a simple solution which would be preferable and then doing nothing to achieve or require compliance. Surely, it should not be too much of a challenge for Wyoming to be as specific and determinative to adopt the progressive process followed in New Mexico, North Carolina, Kansas, Oregon and Colorado. *See also Holley,* 942 F.2d 916, where the conviction in a non-homicide case was reversed for failure to give a unanimity instruction; *People v. Johnson,* 197 Ill. App.3d 74, 143 Ill.Dec. 761, 554 N.E.2d 696 (1990), where separate verdicts were used in very recent cases; *Huffman v. State,* 543 N.E.2d 360 (Ind.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 3257, 111 L.Ed.2d 767 (1990); *Dechaine,* 572 A.2d 130; and *Allard,* 557 A.2d 960. Waiver by neglect to request singularly valuable separate findings in jury verdict no matter how competent the legal representation proved equally and adversely efficacious in *United States v. Garcia,* 938 F.2d 12 (2nd Cir. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 868, 116 L.Ed.2d 774 (1992).

Separate verdicts or special interrogatories should not constitute an unreasonable requirement in the interest of certainty at trial with specificity and clarity consequently provided for appellate review. *Sides,* 944 F.2d 1554. The appellate court has no business deciding for itself if or how there is sufficient evidence to convict if the instructional process may have actually confused the jury. *See Nye & Nissen v. United States,* 336 U.S. 613, 629, 69 S.Ct. 766, 774–75, 93 L.Ed. 919 (1949), Murphy, J., dissenting. Patchwork verdicts should find no accepted place in Wyoming law. *Marquez,* 692 P.2d 1089; *Johnson,* 545 N.E.2d at 645; Hayden J. Trubitt, *Patchwork Verdicts, Different–Jurors Verdicts, and American Jury Theory: Whether Verdicts Are Invalidated by Jury Disagreement on Issues,* 36 Okla.L.Rev. 473 (1983).

Verdict forms requiring (or permitting) unanimity in decision by the jury should be required. *Cloman* and *Price* made bad law. The sooner this is recognized, the better the substance of Wyoming criminal justice proceedings will be. It will be done, but I would do it now.

## VII.

## CONCLUSION

*Bouwkamp,* now serving a life sentence for first degree murder, under the circumstances of his trial, was effectively convicted of an offense of accessory after the fact, which he admitted and for which he was not charged, and denied proper opportunity to present his defense of innocence to the aiding or betting or accessory in the commission of a homicide which he absolutely denied. Whether completely innocent or totally guilty of criminal responsibility for the killing, Bouwkamp was denied the constitutional right to adequately defend.

In this process, the majority makes monumentally bad law for future Wyoming jurisprudence in finite justification of a mandatory presumption to convert the admitted accessory after the fact criminal conduct

into guilt of an offense invoking a life sentence for first degree murder.

These decisive misapplications and misconstructions of deep-seated legal principles, each combined with the fact finding exercise now pursued by this court in assiduously guessing what the jury might have done within the evidence presented, offend law and justice where:

1. Bouwkamp was denied a theory of defense instruction—*theory of defense.*

2. The majority misapplies the admitted guilt of accessory after the fact by misunderstanding its nature and temporal relationship as a separate criminal offense—*nature of accessory after the fact crime.*

3. The majority creates a presumption that by transactional interrelationship and lack of mutuality of causative proof, an accessory after the fact is equally responsible in criminal conduct with the co-participant or accessory—*instruction that temporal relationship is immaterial.*

4. Jury confusion was engendered with one verdict for either felony murder or premeditated murder resulting in admission of accessory after the fact conduct to prove either or both felony murder or premeditated murder without uniformity of jury decision required—*unanimous jury verdict issue.*

Bouwkamp may in fact have been guilty despite his testimony to the contrary based on the most fragmentary evidence of either or both aiding and abetting or participation in premeditated murder or felony murder by stealing the boots of the casually acquainted drunken party participant. Alternatively, he may be completely innocent of the first degree murder crime and only involved in reprehensible action as an accessory after the fact. The jury did not determine within proper instructions which may have been the case and there is absolutely nothing this court or any member can do to reliably make that factual decision as to what the jury might have done if the decision had been required. The structure of the law we build goes in the wrong direction.

A curiosity of the adjudicative business is that a Wyoming law journal publication in thoughtful discourse examined this area of Wyoming law and, for some reason, no one seems to have researched or at least cited the publication. Barbara L. Lauer, Comment, *supra,* XIX Land & Water L.Rev. at 224 provided a comprehensive analysis of the subject, including significant cases like *Gipson, Sullivan* and the *Green* cases, outlined variant solutions with the principal burden falling on the review courts, and finally concluded:

A basic requirement of criminal jury trials is that the jury must reach agreement. The practice of submitting alternatives to a jury not instructed they must reach agreement on at least one alternative, allows a jury to return a special verdict of guilty without the necessary agreement. Broad reforms are available to insure jury agreement in such cases. Until these reforms are accomplished, better use of the available tools will go far toward assuring jury agreement. The currently available tools include the prosecutor's charging discretion, judgment of acquittal, jury instructions, and, in limited situations, special verdicts. These tools should be utilized to mould verdicts based on jury agreement, in accord with the basic requirements of criminal jury trials.

That message continues to be ignored.

I respectfully dissent.